[No. B218956. Second Dist., Div. Three. Apr. 7, 2010.]

PATRICK KIRK et al., Plaintiffs and Respondents, v.
FIRST AMERICAN TITLE INSURANCE COMPANY et al., Defendants and Appellants.

COUNSEL

Horvitz & Levy, David M. Axelrad, Lisa Perrochet; Haight Brown & Bonesteel, Peter Q. Ezzell and Nancy E. Lucas for Defendants and Appellants.

Allen Matkins Leck Gamble Mallory & Natsis, Marvin E. Garrett; Best Best & Kreiger, Robert J. Hanna; Bingham McCutchen, Michael J. Plishner; Boies, Schiller & Flexner, David W. Shapiro; Cooley Godward Kronish, Ann M. Mooney; DLA Piper, William S. Boggs, Stanley J. Panikowski; Dykema Gossett, Alex W. Craigie; Gibson, Dunn & Crutcher, Dean Kitchens, Robert E. Palmer; Weil Gotshal & Manges, Jason D. Kipnis; Greenberg Traurig, Frank E. Merideth, Jr.; Jones Day, Elwood Lui; K&L Gates, Paul W. Sweeney, Jr.; Latham & Watkins, Robert J. Malionek; Mayer Brown, Neil M. Soltman; Morrison & Foerster, Douglas L. Hendricks; O'Melveny & Myers, Martin S. Checov; Orrick, Herrington & Sutcliffe, Lawrence B. Low; Paul, Hastings, Janofsky & Walker, Geoffrey L. Thomas; Perkins Coie, Dan L. Bagatell; Pillsbury Winthrop Shaw Pittman, Ronald E. Van Buskirk; Reed Smith, Margaret M. Grignon; Schiff Hardin, Eliot S. Jubelirer; Sidley Austin, Mark E. Haddad; King & Spalding and Donald F. Zimmer, Jr., as Amici Curiae on behalf of Defendants and Appellants.

The Bernheim Law Firm, Bernie Bernheim, Nazo S. Semerdjian, Wilson K. Park; The Kick Law Firm, Taras Kick, Matthew Hess and Thomas Segal for Plaintiffs and Respondents.

Hinshaw & Culbertson, Ronald E. Mallen and Kara Farmer as Amici Curiae on behalf of Plaintiffs and Respondents.

OPINION

CROSKEY, J.—When an attorney obtains confidential information from a client, that attorney is prohibited from accepting a representation adverse to the client in a matter to which the confidential information would be material. In this case, we are not concerned with the issue of disqualifying the attorney possessing the material client confidences from representing an adverse party; it is conceded that the attorney is disqualified from doing so. Instead, we are concerned with the issue of the vicarious disqualification of the attorney's entire law firm. We conclude that, under the circumstances of this case, *automatic* vicarious disqualification is not required, and that, instead, there is a *rebuttable* presumption that the attorney's knowledge of client confidences is imputed to the firm, which can be refuted by evidence that the law firm adequately screened the attorney from the others at the firm representing the adverse party. In addition, as the disqualified attorney has left the firm, the

trial court's examination of the screen's adequacy should be on a retrospective, not prospective, basis.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Underlying Litigation*

The instant attorney disqualification dispute arose in the context of four related class actions brought against First American Title Insurance Company and related First American entities (collectively, First American). Each class action is based on different allegations, although they each challenge business practices of First American as violative of, among other things, various consumer protection laws.[1] One class action alleges that First American pays kickbacks to lenders for referring business to it. The second action alleges that First American imposes title-related or escrow-related fees in excess of the rates First American filed with California's Department of Insurance, and that customers were not given discounts to which they were entitled. The third action alleges specific fee overcharges (subescrow fee, wire transfer fee, messenger fees), kickbacks, and charging customers for one type of policy based on the pricing for a different type. The fourth action alleges charges for more expensive policies than those sought, and kickbacks. The first of these four actions was filed on February 25, 2005. In each case, plaintiffs were represented by The Bernheim Law Firm and The Kick Law Firm (collectively, plaintiffs' counsel).[2] Collectively, we refer to the cases as the related class actions.

First American was represented by Bryan Cave LLP. Three attorneys at Bryan Cave, Joel D. Siegel, Charles Newman, and Jason Maschmann (the First American team), were primarily responsible for the defense of the related class actions. Newman was first retained as counsel for First American in 1997; he defended against the related class actions from their initial filing. Together, the First American team has defended First American in 80 class actions across the country, and has also been retained to give legal advice to First American. The attorneys on the First American team are very familiar with, and have good rapport with, First American's in-house counsel, officers, and management employees. They "are uniquely and extensively knowledgeable about First American's personnel, products, services, data systems, history and organization on a national basis, including . . . California."

---

[1] We have greatly simplified the allegations of the underlying actions.

[2] The first action was brought by the Law Offices of Bernie Bernheim—apparently, the predecessor of The Bernheim Law Firm—and Parisi & Havens LLP. At some point, Parisi & Havens was substituted out and The Kick Law Firm was substituted in.

The related class action litigation is large, time consuming, and expensive. A discovery referee was appointed and handled numerous disputes.[3] The First American team defended multiple depositions and reviewed hundreds of thousands of pages of documents. By April 2009, First American had incurred over $5.5 million in attorney's fees in the related class actions and another $1 million in additional expenses. The related class actions are extremely complex and have been aggressively litigated.

### 2. *Plaintiffs' Counsel Contact Gary Cohen*

At one time, Gary Cohen had been deputy commissioner and general counsel at California's Department of Insurance. In October 2007, he was chief counsel for Fireman's Fund Insurance Company. During that month, plaintiffs' counsel spoke by telephone with Cohen and solicited his services as a consultant in the related class actions, apparently due to his experience at the Department of Insurance.

After introductions by a mutual acquaintance, a 17-minute phone call took place between Cohen and plaintiffs' counsel. While it is clear that some portion of the conversation was devoted to Cohen's experience and qualifications, it is *undisputed* that plaintiffs' counsel, during this conversation, conveyed confidential information to Cohen material to the related class actions. Indeed, Attorney Bernheim specifically told Cohen that plaintiffs' counsel would be discussing confidential information. While the precise content of the information disclosed is not identified, plaintiffs' counsel conveyed attorney work product to Cohen, including plaintiffs' theories of the case, and their concerns regarding defense strategy and tactics. Plaintiffs' counsel also disclosed their estimates of the value of the cases.

Cohen expressed his interest in the related class actions, but indicated that he had to obtain permission from his employer before he could work with plaintiffs' counsel. A series of e-mails followed, the upshot of which was that Cohen declined the consultant position because it was possible that Fireman's Fund had provided directors and officers coverage to one or more of the First American entities.[4] Cohen did not, however, cut off all communication with plaintiffs' counsel. Instead, when plaintiffs' counsel asked if, despite Cohen's inability to become plaintiffs' consultant, plaintiffs' counsel could "make

---

[3] The record includes the discovery referee's *10th* recommendation, regarding *14* separate motions.

[4] After Cohen declined, plaintiffs' counsel responded with *further* information about the case, and an offer of "full time employment." We need not consider whether any of the information conveyed *after* Cohen declined the consultant position is to be protected as confidential, as it is undisputed that confidential information was conveyed during the initial 17-minute telephone call.

contact with [Cohen] one more time regarding [his] thoughts," Cohen responded that he would telephone plaintiffs' counsel later.[5]

Nothing further happened relevant to this matter for more than a year. Then, on December 8, 2008, the law firm of Sonnenschein Nath & Rosenthal LLP (Sonnenschein) issued a press release announcing that Cohen would join its San Francisco office as a partner in its insurance regulatory practice group on January 5, 2009.

Upon learning that Cohen would be leaving Fireman's Fund—and the possible conflict associated with that employment—plaintiffs' counsel again e-mailed Cohen and reasserted their interest in hiring him as an expert consultant. On January 12, 2009, after Cohen had moved to Sonnenschein, Cohen responded, stating that he would do a conflicts check and asking for one of the complaints to be sent to him by e-mail. The next day, plaintiffs' counsel sent to Cohen edited versions of the complaints (reducing them to what plaintiffs' counsel believed to be the main issues). Less than a half-hour later, Cohen responded, "It turns out that the firm does represent First American, so I'm afraid that I won't be able to be of any help. I haven't read the attachments to your email and will delete them without having read them." There was no further contact between Cohen and plaintiffs' counsel.

### 3. The First American Team Moves to Sonnenschein

On February 2, 2009, the First American team moved from Bryan Cave to Sonnenschein. Siegel moved to Sonnenschein's Los Angeles office, while Newman and Maschmann moved to Sonnenschein's St. Louis office. None of the First American team moved to the San Francisco office, where Cohen was located. Nor does it appear that any of them were part of the insurance regulatory practice group, in which Cohen practiced.

On February 3, 2009, First American filed substitutions of counsel in the related class actions, reflecting that Sonnenschein was now handling its defense, although the three main attorneys representing First American did not change. On February 4, 2009, plaintiffs filed a case management statement in which they "objected" to the representation of First American by Sonnenschein, due to their prior confidential consultation with Cohen. Until that point, the First American team had been unaware of Cohen's prior contacts with plaintiffs' counsel. That day, Siegel contacted John Koski, a partner in Sonnenschein's Chicago office who serves as the firm's general counsel and sits on the firm's ethics committee. Koski discussed the matter

---

[5] It appears that a final telephone call was held, but it was between Cohen and the mutual acquaintance, not plaintiffs' counsel.

with Siegel and Newman, and "had a separate, private discussion" with Cohen. Thereafter, Koski established an ethical screen around Cohen. That night, Koski sent a memorandum to all attorneys, paralegals, and secretaries at Sonnenschein, setting forth "mandatory screening procedures" for the related class actions.

The screening memorandum recites that it was created to "formalize and memorialize the procedures necessary to assure that no confidences or secrets relating to the [related class actions] will be disclosed, even inadvertently, to [the First American team] or any other Sonnenschein lawyer who may be asked to work on the [related class actions]." The memorandum indicated that the failure to observe the procedures would subject the offender to discipline. The memorandum provided that (1) Cohen could not work on the related class actions; (2) no attorney or paralegal who may work on the related class actions may discuss them with Cohen; (3) Cohen may not be given nonpublic documents pertaining to the related class actions; (4) Cohen shall not access any documents on Sonnenschein's computer network pertaining to the related class actions; and (5) no fees from any work related to the related class actions would be apportioned to Cohen.

### 4. *Cohen Works on the* Lyons *Matter*

The First American team also represents First American in another matter, referred to as the *Lyons* case, which is now pending in the Superior Court for the County of Contra Costa. (*Lyons v. First American Title Ins. Co.* (Super. Ct. Contra Costa County, No. C08-01850).) In the *Lyons* case, the plaintiffs, who are African-American, claim racially discriminatory pricing policies in connection with the sale of lenders' refinancing title policies.[6] The *Lyons* plaintiffs are not represented by plaintiffs' counsel in the related class actions.

In January 2009, before the First American team had moved from Bryan Cave to Sonnenschein, it obtained an order in the *Lyons* case staying the action and requiring the plaintiffs to exhaust their administrative remedies with the Department of Insurance. The *Lyons* plaintiffs thereafter wrote a letter to the Department of Insurance requesting the department to decline jurisdiction and return the matter to the trial court. On March 5, 2009, Sonnenschein wrote a letter in opposition. The letter was written by the First American team, but Cohen had participated in its drafting. Cohen subsequently admitted billing a total of 3.35 hours to the *Lyons* matter; according

---

[6] The theory of the *Lyons* case is that First American charged higher fees in connection with "nonprime" loans, and that African-Americans are disproportionately more likely to have a nonprime loan.

to his declaration, his involvement "was limited to providing advice as to the best approach to correspond with the Department with respect to the Lyons' claims."[7]

The issue of exhaustion of administrative remedies was also an issue in the related class actions. By the time the First American team moved to Sonnenschein, it had filed and fully briefed demurrers which raised the issue of exhaustion in two of the related class actions, although the court had not yet held a hearing on the demurrers. In April 2009, First American filed additional briefing on the demurrers, calling the trial court's attention to similar favorable rulings in other trial courts, including the trial court order requiring exhaustion it had obtained in the *Lyons* case. As we later discuss, Cohen's work on the *Lyons* matter, and the First American team's subsequent citation to a *Lyons* order in the related class actions, were the cause of substantial concern to the trial court.

### 5. The Disqualification Motion

On March 18, 2009, plaintiffs moved to disqualify Sonnenschein from further representation of the First American defendants, based on plaintiffs' counsel's prior confidential communications with Cohen. Sonnenschein opposed the motion, although it retained independent counsel to prepare the opposition in order to preserve its ethical wall. Much of the dispute centered on whether plaintiffs' counsel actually conveyed confidential information to Cohen; this is not an issue on appeal. As to whether the entire Sonnenschein firm should be vicariously disqualified, Sonnenschein relied on the ethical screening wall it had constructed. Both Cohen[8] and Siegel[9] submitted declarations indicating their compliance with the ethical screening wall. First American also submitted the declaration of its senior vice-president and national litigation counsel, who testified to the key experience of the First American team and their irreplaceability. Specifically, he stated that it would cost First American millions of dollars to retain new counsel sufficiently

---

[7] Cohen states that he billed a total of 3.35 hours to the *Lyons* matter "[i]n March and April 2009." As First American's letter was sent on March 5, 2009, it is unclear what work Cohen did on the *Lyons* matter in April, after the letter had been sent.

[8] In his April 20, 2009 declaration in opposition to the disqualification motion, Cohen stated that he never spoke with, or e-mailed, the First American team for any reason other than a brief inadvertent contact at a partner retreat. When plaintiffs responded with evidence that Cohen had participated in the *Lyons* matter six weeks earlier, Cohen submitted a supplemental declaration indicating that he "provided some very brief assistance" in the *Lyons* matter. The trial court did not believe that Cohen intentionally hid his work on that matter. Instead, it concluded that Cohen had simply "forgot[ten]" his work on the *Lyons* case.

[9] In addition, Siegel declared that neither Newman nor Maschmann had spoken with Cohen regarding the related class actions. It is not clear why Newman and Maschmann did not provide their own declarations.

prepared to defend the related class actions, "although it would be impossible for new counsel to attain the level of knowledge and proficiency of First American's current attorneys."

### 6. Order Granting Disqualification

The trial court ultimately granted the motion for disqualification. In its order, the trial court indicated that, "[n]o one is to blame for this situation except perhaps the itinerant nature of attorneys that has developed over the last fifteen years." The trial court found that plaintiffs' counsel disclosed confidential and privileged attorney work product information to Cohen during the initial 17-minute telephone call, a conclusion not challenged on appeal.

As to vicarious disqualification, the court reviewed applicable case law, and concluded that, when an attorney possesses disqualifying confidential client information, vicarious disqualification of the law firm is *automatic*, regardless of any ethical screening wall created.

The trial court further concluded, however, that even if California law permitted the use of ethical walls in this context, "there is evidence that the wall Sonnenschein erected has not been a complete success." Specifically, the trial court was concerned about the work Cohen had performed on the *Lyons* matter. The trial court believed that Cohen's work on the *Lyons* matter constituted a breach of the ethical wall, and the fact that Cohen initially forgot about his work on the *Lyons* matter illustrates why California courts are leery of ethical walls. The trial court was careful to state that no party deliberately engaged in unethical behavior, but instead concluded that the ease with which one can accidentally reveal client confidences demonstrates that an ethical wall is insufficient.

Additionally, the trial court indicated that the balance of interests weighed in favor of disqualification. The court recognized "the substantial financial burden disqualification places on [First American], who will have to obtain new counsel and bring them up the learning curve on these very complex cases that have been litigated over a number of years." However, the court found that two competing policy interests outweighed these concerns. Specifically, the court relied on the need for vigorous representation of parties by independent counsel unencumbered by conflicts of interest, and the preservation of public trust in the scrupulous administration of justice and the integrity of the bar.

First American and Sonnenschein[10] filed timely notices of appeal.[11] Pursuant to a stipulation of the parties, we issued a qualified stay of all trial court proceedings in the related class actions pending our resolution of the predicate question raised by the trial court's disqualification order. Due to the obvious need to quickly resolve the issue, we have, pursuant to the agreement of the parties, imposed an expedited briefing and oral argument schedule. In addition, we have permitted various law firms to file amicus curiae briefs on behalf of both First American and Sonnenschein, and plaintiffs.

## ISSUES ON APPEAL

It is undisputed that Cohen possessed confidential client or attorney work product information from plaintiffs' counsel that is material to the related class actions. It is also undisputed that Cohen is disqualified from representing First American in the related class actions. The first issue presented by this appeal is whether Sonnenschein must be *automatically* vicariously disqualified from representing First American, or if it may avoid vicarious disqualification by the construction of a proper ethical wall. Concluding that vicarious disqualification is not automatic, but may be rebutted by a proper ethical wall, we reach the second issue, which is the standards by which a proper ethical wall is to be judged. A third issue is raised by a fact which came to light while this appeal was pending. Cohen left the Sonnenschein firm, effective January 15, 2010, to return to government service. We therefore must also consider the impact of this fact on the necessary analysis of the important issues raised in this appeal.

## DISCUSSION

### 1. Standard of Review

"A trial court's authority to disqualify an attorney derives from the power inherent in every court '[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto.' [Citations.]" (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1145 [86 Cal.Rptr.2d 816,

---

[10] Although not a party to the underlying action, Sonnenschein, which was disqualified from continuing representation of the First American defendants, has standing to appeal the disqualification order. Disqualified attorneys themselves have standing to challenge the orders disqualifying them. (*A.I. Credit Corp., Inc. v. Aguilar & Sebastinelli* (2003) 113 Cal.App.4th 1072, 1077 [6 Cal.Rptr.3d 813].)

[11] The order granting the motion to disqualify counsel is appealable as a final order on a collateral matter. (*Henriksen v. Great American Savings & Loan* (1992) 11 Cal.App.4th 109, 111, fn. 1 [14 Cal.Rptr.2d 184].)

980 P.2d 371] (*SpeeDee Oil*).) "A motion to disqualify a party's counsel may implicate several important interests. Consequently, judges must examine these motions carefully to ensure that literalism does not deny the parties substantial justice. [Citation.] Depending on the circumstances, a disqualification motion may involve such considerations as a client's right to chosen counsel, an attorney's interest in representing a client, the financial burden on a client to replace disqualified counsel, and the possibility that tactical abuse underlies the disqualification motion." (*Id.* at pp. 1144–1145.) Disqualification motions involve "a conflict between the clients' right to counsel of their choice and the need to maintain ethical standards of professional responsibility. [Citation.] The paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar. The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process." (*Id.* at p. 1145.)

"Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion. [Citations.] If the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence. [Citations.] When substantial evidence supports the trial court's factual findings, the appellate court reviews the conclusions based on those findings for abuse of discretion. [Citation.] However, the trial court's discretion is limited by the applicable legal principles. [Citation.] Thus, where there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law. [Citation.] In any event, a disqualification motion involves concerns that justify careful review of the trial court's exercise of discretion." (*SpeeDee Oil, supra*, 20 Cal.4th at pp. 1143–1144.)

## 2. *Historical Development of the Law Regarding Vicarious Disqualification*

■ Generally speaking, the California State Bar's Rules of Professional Conduct govern attorney discipline; they do not create standards for disqualification in the courts. (*Hetos Investments, Ltd. v. Kurtin* (2003) 110 Cal.App.4th 36, 47 [1 Cal.Rptr.3d 472].) Nonetheless, as will be seen in our discussion, courts analyzing questions of disqualification often look to the Rules of Professional Conduct for guidance.

California Rules of Professional Conduct, rule 3-310(E) provides, "A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has

obtained confidential information material to the employment."[12] While the Model Rules of Professional Conduct promulgated by the American Bar Association (ABA) address the issue of *vicarious* disqualification (see ABA Model Rules Prof. Conduct, rule 1.10), the California Rules of Professional Conduct do not.[13] Thus, in California, vicarious disqualification rules are the result of decisional law. (*City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839, 847 [43 Cal.Rptr.3d 771, 135 P.3d 20].) It is useful for our analysis that we first discuss the development of California law in this area in some detail.[14]

### a. *Case Law Initially Provides for a Case-by-case Analysis*

Our discussion begins with *Chambers v. Superior Court* (1981) 121 Cal.App.3d 893 [175 Cal.Rptr. 575]. In *Chambers*, the Third District Court of Appeal was concerned not with the usual situation of a tainted attorney moving from one private law firm to another, but an attorney moving from government employment to private employment. It was not established that the tainted attorney actually possessed confidential client information, but only that he had had access to it. In considering whether the tainted attorney's conflict should be imputed to the rest of the firm, the court took guidance from the ABA rules regarding disqualification of former government employees. The ABA rules provided that the tainted attorney himself would not be disqualified unless he had " 'substantial responsibility' " for the matter while a public employee. (*Id.* at p. 898.) A formal ethics opinion concluded that this limitation was imposed in order to " 'inhibit government recruitment as little as possible and to enhance the opportunity for all litigants to obtain competent counsel of their own choosing, particularly in specialized areas.' " (*Id.* at p. 899.) The ethics opinion went on to conclude, " 'An inflexible extension of disqualification throughout an entire firm would thwart those purposes. So long as the individual lawyer is held to be disqualified and is screened from any direct or indirect participation in the matter, the problem of his switching sides is not present; by contrast, an inflexible extension of disqualification throughout the firm often would result in real hardship to a client if complete withdrawal of representation was mandated, because substantial work may

---

[12] We again stress that there is no dispute that Cohen is prohibited from representing First American in the related class actions.

[13] Recently, California considered adopting an ethical rule regarding vicarious disqualification, based, in part, on ABA Model Rules of Professional Conduct, rule 1.10. However, the State Bar board of governors ultimately determined not to recommend the adoption of any such rule. We will briefly discuss the history of the proposed rule below.

[14] In most cases, the issue concerned an attorney who, under the Rules of Professional Conduct, was personally disqualified from the representation of a client at the attorney's new place of employment. We will refer to that attorney as the "tainted attorney." It is not necessarily the case, however, that a tainted attorney must personally possess confidential client information.

have been completed regarding specific litigation prior to the time the government employee joined the partnership, or the client may have relied in the past on representation by the firm.' " (*Ibid.*) The ethics opinion specifically expressed concern that if vicarious disqualification were always the rule for former government employees, this would restrict a former government employee's options for future employment, and potentially harm the government's ability to attract talented attorneys. (*Ibid.*) The *Chambers* court was persuaded by this analysis, and adopted the approach of *not* automatically requiring vicarious disqualification of a former government employee's new law firm. (*Id.* at pp. 902–903.)

The next case relevant to our discussion is *William H. Raley Co. v. Superior Court* (1983) 149 Cal.App.3d 1042 [197 Cal.Rptr. 232]. In that case, the plaintiff sued a defendant, the stock of which was entirely owned by a testamentary trust. The trustee of the trust was a bank, which discharged its responsibilities through a committee appointed by its board of directors. The tainted attorney was both a director of the bank and a member of the committee; it was undisputed that the tainted attorney could not represent the plaintiff. The issue was whether the tainted attorney's entire firm was vicariously disqualified from doing so. The court ultimately concluded that *the tainted attorney's attempt at ethical walls (both at the firm and the bank) did not sufficiently outweigh the risk to the defendant's confidential information*, and therefore mandated vicarious disqualification of the firm. (*Id.* at p. 1049.)

Important for our analysis, however, is the fact that the court did not apply an absolute rule of vicarious disqualification. The court concluded that "[a]utomatic or mechanical application of the vicarious disqualification rule can be harsh and unfair to both a law firm and its client." (*William H. Raley Co. v. Superior Court, supra*, 149 Cal.App.3d at p. 1049.) Instead, the court reasoned that "[t]he better approach is to examine the circumstances of each case . . ." in light of the applicable competing interests. (*Ibid.*) "The court must weigh the combined effect of a party's right to counsel of choice, an attorney's interest in representing a client, the financial burden on a client of replacing disqualified counsel and any tactical abuse underlying a disqualification proceeding against the fundamental principle that the fair resolution of disputes within our adversary system requires vigorous representation of parties by independent counsel unencumbered by conflicts of interest. [Citations.] In a case such as this the court also must consider in favor of disqualification the disruptive effect of repeated disqualification proceedings on *the administrative process of the court* [citation] and the financial burden of such proceedings on the moving party." (*Id.* at p. 1048.)

In 1984, the same court which had decided *Chambers* returned to the issue of vicarious disqualification in *Dill v. Superior Court* (1984) 158 Cal.App.3d

301 [205 Cal.Rptr. 671]. The tainted attorney in that case had been personally involved with the representation of a plaintiff (taking depositions and appearing at a hearing), and subsequently left the firm and began working at the firm representing the defendant. The defendant's firm argued that the appellate court had rejected vicarious disqualification in *Chambers*. (*Id.* at p. 304.) The court disagreed, and distinguished *Chambers* on three grounds: (1) the tainted attorney in *Dill* had actually performed legal work on behalf of his former client in the same matter; (2) vicarious disqualification of a former government employee's firm "is not imposed as strictly as it is in other instances"; and (3) any appearance of impropriety in *Chambers* by the firm's continued representation "was greatly outweighed by the benefits to the judicial process of representation by an attorney with relevant governmental experience." (*Id.* at pp. 305–306.) In this case, the court concluded that the tainted attorney's "personal involvement" on the former client's behalf in the identical litigation compelled vicarious disqualification of the firm. (*Id.* at p. 306.) The *Dill* court, however, did not adopt an absolute rule of vicarious disqualification in all situations not involving former government attorneys. Instead, the court found compelling the fact that the tainted attorney was personally involved on the adverse party's behalf in the same litigation.

In *Klein v. Superior Court* (1988) 198 Cal.App.3d 894 [244 Cal.Rptr. 226], the Sixth Appellate District held that when a tainted attorney actually possesses confidential client information, and there has been no attempt to screen him from the litigation from which he is disqualified, vicarious disqualification of the firm is mandated. (*Id.* at pp. 913–914.) The court observed that, with the exception of former government attorneys, no California case appeared to have permitted disqualification of a tainted attorney without disqualifying the entire firm. (*Id.* at pp. 912–913.) Nonetheless, the court distilled from *Chambers* the rule that an ethical screen "can suffice, in a proper case. The test is whether the individual attorney had any responsibility over matters related to the instant action or had acquired confidential information regarding the action and whether the firm had taken sufficient protective measures to screen the attorney from participation."[15] (*Klein*, at p. 909.)

---

[15] A subsequent case cited *Klein* for the proposition that the courts "disagree on whether vicarious disqualification should be automatic in attorney conflict of interest cases, or whether a presumption of shared confidences should be rebuttable." (*In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572, 593 [283 Cal.Rptr. 732].) We do not see *Klein* recognizing such a split in authority, but rather acknowledging that the presumption is rebuttable, but had rarely been found to have been rebutted.

### b. Henriksen *Concludes That, in Certain Circumstances, Vicarious Disqualification Is Mandatory*

The next development came in 1992, in *Henriksen v. Great American Savings & Loan, supra,* 11 Cal.App.4th 109 (*Henriksen*). This case concerned a tainted attorney who had switched sides in the same case; the trial court disqualified the new firm, even though the firm had attempted to isolate the tainted attorney. In *Henriksen,* Division Four of the First Appellate District affirmed the firm's vicarious disqualification, setting forth an absolute rule that ethical walls are not sufficient, and vicarious disqualification is mandatory, when the tainted attorney: (1) is a nongovernment attorney; (2) who formerly represented, and therefore possesses confidential information from, a party; and (3) who switches sides in the same case. (*Id.* at pp. 115, 117.) This rule is certainly in line with the holding in *Dill,* but appears to be the first time an *absolute rule* of vicarious disqualification was set forth in a California opinion.

### c. *The Supreme Court, in Dicta, Appears to Adopt and Extend* Henriksen *to All Cases of Vicarious Disqualification*

■ In 1994, the Supreme Court addressed a problem relating to the duty of attorney loyalty. (*Flatt v. Superior Court* (1994) 9 Cal.4th 275 [36 Cal.Rptr.2d 537, 885 P.2d 950] (*Flatt*).)[16] In the course of its discussion, the Supreme Court distinguished the duty of *loyalty,* which was at issue in that case, from the duty of client *confidentiality,* which is at issue in cases of vicarious disqualification. To properly understand *Flatt* in context, however, it is necessary to briefly discuss the "substantial relationship" test. When it is alleged by a former client that its former attorney possesses material confidential information and is therefore disqualified from representing an adversary in *another* case, it is difficult for the former client to establish, as a factual matter, "what is in the mind of the attorney." (*Western Continental Operating Co. v. Natural Gas Corp.* (1989) 212 Cal.App.3d 752, 759–760 [261 Cal.Rptr. 100].) The courts have therefore established a test, under which, if the former client can demonstrate a substantial relationship between the subjects of the former and the current representations, it is presumed that the attorney had access to confidential information in the first representation which is relevant to the second representation. (*Flatt, supra,* 9 Cal.4th at p. 283.)

---

[16] In *Flatt, supra,* 9 Cal.4th at pages 278–279, an attorney interviewed a prospective client regarding a suit the prospective client wanted to bring. The attorney then realized that the target of the action was another client. The attorney declined the new representation, without advising the prospective client regarding the statute of limitations or that new counsel should be sought. The issue before the Supreme Court was whether the duty of client loyalty had *prohibited* the attorney from giving such advice to the prospective client, which would have harmed the existing client.

In discussing the substantial relationship test in *Flatt*, the Supreme Court stated that once the test is met, "disqualification of the attorney's representation of the second client is mandatory; indeed, the disqualification extends vicariously to the entire firm." (*Flatt, supra*, 9 Cal.4th at p. 283.) The Supreme Court cited *Henriksen* for the proposition that vicarious disqualification is compelled as a matter of law. (*Ibid.*) The *Flatt* case, however, was not concerned with whether a tainted attorney's law firm was subject to vicarious disqualification.

■ "[O]ur Supreme Court's decisions bind us, and its dicta command our serious respect. [Citations.] However, 'language contained in a judicial opinion is " 'to be understood in the light of the facts and issue then before the court, and an opinion is not authority for a proposition not therein considered. [Citation.]' " [Citations.]' [Citation.] When questions about an opinion's import arise, the opinion 'should receive a reasonable interpretation [citation] and an interpretation which reflects the circumstances under which it was rendered [citation]' [citation], and its statements should be considered in context [citation]." (*Dyer v. Superior Court* (1997) 56 Cal.App.4th 61, 66 [65 Cal.Rptr.2d 85].)

In the context of *Flatt*, the Supreme Court's citation of *Henriksen* with approval and statement of a rule of automatic vicarious disqualification should not be read as a binding adoption of a rule of automatic vicarious disqualification *in all circumstances*, as the issue was not then before the Supreme Court. Indeed, as we will now discuss, the Supreme Court itself has subsequently indicated that the question of whether vicarious disqualification can be overcome by the creation of an ethical wall is still an open one. Prior to that indication, however, appellate courts rejected attempts to avoid vicarious disqualification with the creation of ethical screening walls simply by quoting the language of *Flatt*. (See, e.g., *Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft* (1999) 69 Cal.App.4th 223, 238 [81 Cal.Rptr.2d 425].)

> d. *The Supreme Court Recognizes That Whether Vicarious Disqualification Is Always Absolute Is Still an Open Question*

In 1999, the issue of vicarious disqualification was more directly presented to the Supreme Court in *SpeeDee Oil, supra*, 20 Cal.4th 1135. In setting forth the issue presented by that case, the court stated, "When a conflict of interest requires an attorney's disqualification from a matter, the disqualification normally extends vicariously to the attorney's entire law firm. (See *Flatt[, supra*, 9 Cal.4th at p. 283].) This rule safeguards clients' legitimate expectations that their attorneys will protect client confidences. (*Id.* at pp. 283–284.)

Here, we decide whether the same rule should apply when a party unknowingly consults an attorney 'of counsel' to the law firm representing the party's adversary in the subject of the consultation." (*SpeeDee Oil, supra,* 20 Cal.4th at p. 1139.)

The Supreme Court reasoned, "For attorneys in the same firm to represent adverse parties in the same litigation is so patently improper that the rule of disqualification is a per se or 'automatic' one. (See *Flatt, supra,* 9 Cal.4th at p. 284, fn. 3 and accompanying text.[17])" (*SpeeDee Oil, supra,* 20 Cal.4th at p. 1139.) "When attorneys presumptively share access to privileged and confidential matters because they practice together in a firm, the disqualification of one attorney extends vicariously to the entire firm. (*Flatt, supra,* 9 Cal.4th at p. 283.) The vicarious disqualification rule recognizes the everyday reality that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information." (*Id.* at pp. 1153–1154.) "Conflicting representations that would disqualify all of a law firm's attorneys are not more acceptable when an attorney of counsel to the firm creates the conflict. Clients, and the public, should expect confidentiality and loyalty from attorneys who effectively declare they practice law in a close, personal, and continuing association.[18] These legitimate expectations would be frustrated if a firm could represent one party in litigation while an attorney of counsel to the firm represented an adversary in the same case." (*SpeeDee Oil, supra,* 20 Cal.4th at pp. 1139–1140.)

After the Supreme Court concluded that the firm should be vicariously disqualified, the court went on to state, "In any event, we need not consider whether an attorney can rebut a presumption of shared confidences, and avoid disqualification, by establishing that the firm imposed effective screening procedures." (*SpeeDee Oil, supra,* 20 Cal.4th at p. 1151.) The Supreme Court found it unnecessary to reach this issue in *SpeeDee Oil* because the court concluded that the firm failed to demonstrate an effective screening process had been established. Nonetheless, the Supreme Court's language suggests that it believed that the question of whether an effective screening wall may rebut the presumption of vicarious disqualification was a question it had not yet resolved.

---

[17] The reference is to a discussion in *Flatt* of the breach of the duty of *loyalty* which occurs by the simultaneous representation of clients whose interests are directly adverse in the same litigation.

[18] Under California Rules of Professional Conduct, rule 1-400(E), standard (8), an attorney cannot represent another attorney as "of counsel," unless there is a relationship which is "close, personal, continuous, and regular."

### e. *More Recent Opinions Are Not Consistent*

In the years following the *SpeeDee Oil* opinion, courts have differed in their response to its language regarding the issue of ethical walls.[19] Some courts have stated that the rule of vicarious disqualification applies *in the absence of an effective ethical screen.* (*Farris v. Fireman's Fund Ins. Co.* (2004) 119 Cal.App.4th 671, 689, fn. 17 [14 Cal.Rptr.3d 618]; *Adams v. Aerojet-General Corp.* (2001) 86 Cal.App.4th 1324, 1333 [104 Cal.Rptr.2d 116].) Other courts, however, have continued to state that the rule of vicarious disqualification is absolute. (See, e.g., *City of Santa Barbara v. Superior Court* (2004) 122 Cal.App.4th 17, 24 [18 Cal.Rptr.3d 403]; *Frazier v. Superior Court* (2002) 97 Cal.App.4th 23, 30 [118 Cal.Rptr.2d 129].)

The Supreme Court itself granted review in a case that raised the issue of whether, when a private attorney is personally disqualified from participation in a matter due to prior adverse representation not arising from public employment, the attorney's entire firm must be disqualified or whether disqualification may be averted by appropriate screening techniques. (*Panther v. Park*, review granted Oct. 23, 2002, S110025.) Review was dismissed, however, on January 15, 2003, after the client dismissed the writ proceeding challenging the representation.

In 2006, the Supreme Court considered the issue of the vicarious disqualification of an entire city attorney's office when the city attorney himself was the tainted attorney. The court concluded that the city attorney cannot be effectively screened from his entire office. (*City and County of San Francisco v. Cobra Solutions, Inc., supra,* 38 Cal.4th at pp. 853–854.) In the course of its discussion, the court cited *SpeeDee Oil* for the proposition that a conflict is normally imputed to the tainted attorney's entire firm on the rationale that attorneys practicing together generally share each other's, and their clients', confidential information. (*Id.* at pp. 847–848.) This language prompted a dissent by Justice Corrigan, joined by Chief Justice George, stating that the automatic disqualification rule "is being questioned even in the private practice context," due to increases in attorney mobility and firm mergers. (*Id.* at p. 855 (dis. opn. of Corrigan, J.).)

In 2008, we stated, "[c]urrently, in the context of private law firms, there is no definitive California authority authorizing ethical walls." (*Sharp v. Next Entertainment, Inc.* (2008) 163 Cal.App.4th 410, 438, fn. 11 [78 Cal.Rptr.3d 37].) Most recently, we addressed the issue in *Meza v. H. Muehlstein & Co.,*

---

[19] Federal cases have taken the position that automatic vicarious disqualification is still the rule in California, but *SpeeDee Oil* is a sign that the California courts may shift. (*In re County of Los Angeles* (9th Cir. 2000) 223 F.3d 990, 995; *UMG Recordings, Inc. v. MySpace, Inc.* (C.D.Cal. 2007) 526 F.Supp.2d 1046, 1060–1061.)

*Inc.* (2009) 176 Cal.App.4th 969 [98 Cal.Rptr.3d 422] (*Meza*), a case involving a tainted attorney possessing confidential information who switched sides in the same lawsuit. Relying on *Henriksen, Flatt*, and the Supreme Court's rationale for vicarious disqualification in *SpeeDee Oil*, we concluded that "an 'ethical wall' between an attorney with confidential information and his or her firm will generally not preclude the disqualification of the firm. [Citation.] Instead, there is a presumption that each member of the firm has imputed knowledge of the confidential information." (*Id.* at p. 979.) Although we stated that an ethical wall will *generally* not preclude disqualification, we did not address in what circumstances an ethical wall *may* preclude disqualification, or whether the presumption can ever be rebutted.

### 3. *Distillation of the Current State of the Law*

In very brief summary, the history of the law of vicarious disqualification appears to be as follows: (1) appellate courts initially concluded vicarious disqualification was not automatic, but instead subject to a balancing test; (2) *Henriksen* concluded the burden of rebutting the presumption of imputed knowledge simply could not be satisfied in the case of a tainted attorney who represented one party and switched sides in the same case; (3) the Supreme Court favorably cited *Henriksen* and appeared to state a rule of automatic vicarious disqualification any time material confidential information was presumed to be held by the tainted attorney (*Flatt*); (4) the Supreme Court subsequently suggested that whether vicarious disqualification can be avoided by a proper ethical wall was still an open question (*SpeeDee Oil*); and (5) the Supreme Court has never directly addressed the issue on the merits.

■ Given this history, we conclude that it is improper to rely on *Flatt* as creating an absolute rule of vicarious disqualification in California. Instead, we believe that neither *Flatt* nor *SpeeDee Oil* addressed the issue of whether vicarious disqualification is absolute, and the state of the law is that as initially expressed by the appellate courts: (1) a case-by-case analysis based on the circumstances present in, and policy interests implicated by, the case; (2) tempered by the *Henriksen* rule that vicarious disqualification should be automatic in cases of a tainted attorney possessing actual confidential information from a representation, who switches sides in the same case.[20]

---

[20] The *Henriksen* rule is based on an understanding that in the most extreme cases of direct conflict, no amount of ethical screening can rebut the presumption of imputed knowledge. While *Henriksen* considered the circumstances of an attorney who obtained numerous client confidences while fully participating in the representation of the client, joining a firm opposing the client in the same case, we need not determine if that is the *only* scenario in which the presumption should be conclusive.

*Pound v. DeMera DeMera Cameron* (2005) 135 Cal.App.4th 70, 74, 76–77 [36 Cal.Rptr.3d 922], stated that *Henriksen* applies to an attorney who switched sides in a case some three

We do not doubt that vicarious disqualification is the *general* rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm. However, we conclude that, in the proper circumstances, the presumption is a rebuttable one, which can be refuted by evidence that ethical screening will effectively prevent the sharing of confidences in a particular case.

### 4. *Other Considerations Support This Conclusion*

While we believe our interpretation of the law follows from our analysis of its historical development, this much seems clear: the Supreme Court has not considered and definitively decided whether the presumption of imputed knowledge can be rebutted in a nongovernment attorney context with evidence of an ethical wall. We therefore consider three factors which lead us to conclude ethical walls should be recognized in California: (1) changing realities in the practice of law which undermine the rationale for an automatic rule of vicarious disqualification; (2) California's favorable experience with ethical walls in other circumstances; and (3) an understanding of policy considerations which supports the recognition of ethical walls in the proper cases.

#### a. *Changing Realities Are Undermining the Rationale for an Automatic Rule of Vicarious Disqualification*

##### (1) *Courts Are Recognizing the Changing Circumstances*

As expressed by the Supreme Court, the vicarious disqualification rule is based on a recognition of "the everyday reality that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information." (*SpeeDee Oil, supra,* 20 Cal.4th at pp. 1153–1154.) This "is not so much a conclusive presumption that confidential information has passed as a pragmatic recognition that the confidential information will work its way to the nontainted attorneys at some point." (*Goldberg v. Warner/Chappell Music, Inc.* (2005) 125 Cal.App.4th 752, 765 [23 Cal.Rptr.3d 116].)

But several cases have questioned this paradigm as representing an outdated view of the practice of law. (*City and County of San Francisco v. Cobra*

---

years after a one-hour meeting with counsel for the other side. We disagree with *Pound* to the extent it sees no qualitative distinction between an attorney who had a brief preliminary meeting with counsel for the first client and an attorney who was actively involved with the first client's representation. In any event, *Pound* did not consider whether the presumption could be rebutted by an appropriate ethical wall, as there had been no attempt made to isolate the tainted attorney; indeed, in that case, the tainted attorney was subsequently *associated as counsel* for the second, opposing, client. (*Id.* at p. 77.)

*Solutions, Inc., supra,* 38 Cal.4th at p. 855 (dis. opn. of Corrigan, J.) ["The automatic disqualification rule arose in the context of private practice, at a time when it was relatively uncommon for attorneys to move from one firm to another. Thus, the rule's burdens were relatively light. Now, however, attorney mobility and firm mergers have increased exponentially. Accordingly, the automatic disqualification rule is being questioned even in the private practice context."]; *Adams v. Aerojet-General Corp., supra,* 86 Cal.App.4th at p. 1336 ["Large law firms . . . are becoming ever larger, opening branch offices nationwide or internationally, and merging with other large firms. Individual attorneys today can work for a law firm and not even know, let alone have contact with, members of the same firm working in a different department of the same firm across the hall or a different branch across the globe."]; *In re Complex Asbestos Litigation, supra,* 232 Cal.App.3d at p. 586 ["In the era of large, multioffice law firms and increased attention to the business aspects of the practice of law, we must consider the ability of attorneys . . . to change employment for personal reasons or from necessity."]; *In re County of Los Angeles, supra,* 223 F.3d at p. 997 ["The changing realities of law practice call for a more functional approach to disqualification than in the past."].) The instant case illustrates the changing landscape of legal practice—we are concerned with the tainted attorney working in a different geographical office and in a different practice group from the attorneys with responsibility for the litigation. These are not attorneys discussing their cases regularly, passing each other in the hallways, or at risk of accidentally sharing client confidences at lunch. In a situation where the "everyday reality" is no longer that all attorneys in the same law firm actually "work[] together," there would seem to be no place for a rule of law based on the premise that they do.[21]

> (2) *Other Jurisdictions Are Also Recognizing and Adapting
> to the Changing Reality*

Other states are very nearly split evenly as to whether to permit ethical screening of attorneys moving from one private law firm to another. Twelve states have adopted rules of professional conduct permitting such screening

---

[21] We note here that amici curiae in support of plaintiffs argue that while the paradigm may be changing for large law firms, the vast majority of California attorneys practice in small firms, and judicial recognition of a rule permitting ethical screening may lead attorneys in small firms to attempt ethical screening in situations in which it cannot be accomplished successfully. We therefore wish to emphasize that we are not adopting a broad rule permitting ethical screening in all cases. In this case, we are simply holding that, consistent with prior authority, *in the proper situation,* ethical screening may be sufficient to rebut the presumption of imputed knowledge. That some attorneys may attempt ethical screening in practices where it could not possibly work is not a sufficient basis to prohibit ethical screening in situations where it may; this is particularly the case when the unnecessary vicarious disqualification of an entire law firm would work a severe hardship on the client deprived of counsel of its choice.

with no limitations based on the scope of the disqualified attorney's prior involvement in the representation. (Del. Rules Prof. Conduct, rule 1.10; Ill. Rules Prof. Conduct, rule 1.10; Ky. Supreme Ct. Rules, rule 3.130(1.10); Md. Rules Prof. Conduct, rule 1.10; Mich. Rules Prof. Conduct, rule 1.10; Mont. Rules Prof. Conduct, rule 1.10; N.C. Rules Prof. Conduct, rule 1.10; Or. Rules Prof. Conduct, rule 1.10; Pa. Rules Prof. Conduct, rule 1.10; R.I. Rules Prof. Conduct, rule 1.10; Utah Rules Prof. Conduct, rule 1.10; Wn. Rules Prof. Conduct, rule 1.10.) An additional 12 states have adopted rules permitting screening when the disqualified attorney was not substantially involved in the prior representation, or under other similar limitations on the attorney's prior involvement.[22] (Ariz. Ethics Rules, rule 1.10; Colo. Rules Prof. Conduct, rule 1.10; Ind. Rules Prof. Conduct, rule 1.10; Mass. Rules Prof. Conduct, rule 1.10; Minn. Rules Prof. Conduct, rule 1.10; Nev. Rules Prof. Conduct, rule 1.10; N.J. Rules Prof. Conduct, rule 1.10; N.M. Rules Prof. Conduct, rule 16-110; N.D. Rules Prof. Conduct, rule 1.10; Ohio Rules Prof. Conduct, rule 1.10; Tenn. Rules Prof. Conduct, rule 1.10; Wis. Supreme Ct. Rules, rule 20:1.10.)

That nearly half of the states have chosen to permit some level of ethical screening in the nongovernment attorney context demonstrates a growing understanding that law is often practiced in firms in which effective screening is possible. In 2009, the ABA Model Rules of Professional Conduct were modified to permit screening of a tainted (non-former-government) attorney at a private law firm. ABA Model Rules of Professional Conduct, rule 1.10 had, for many years, provided for the vicarious disqualification of a law firm when a lawyer in that firm would be prohibited from representing the client due to a conflicting former representation. In February 2009, however, the

---

[22] Moreover, 36 states and the District of Columbia permit ethical screening when the confidential information was conveyed by a former *prospective* client, although these rules generally apply only when the attorney took reasonable measures to avoid exposure to more information than was reasonably necessary to determine whether to accept the representation—a circumstance which arguably did not occur in the instant case. (Alaska Rules Prof. Conduct, rule 1.18; Ariz. Rules Prof. Conduct, rule 1.18; Ark. Rules Prof. Conduct, rule 1.18; Colo. Rules Prof. Conduct, rule 1.18; Conn. Rules Prof. Conduct, rule 1.18; Del. Rules Prof. Conduct, rule 1.18; D.C. Rules Prof. Conduct, rule 1.18; Fla. Bar Rules 4-1.18; Ill. Rules Prof. Conduct, rule 1.18; Ind. Rules Prof. Conduct, rule 32:1.18; Ky. Supreme Ct. Rules, rule 3.130(1.18); La. Rules Prof. Conduct, rule 1.18; Me. Rules Prof. Conduct, rule 1.18; Md. Rules Prof. Conduct, rule 1.18; Minn. Rules Prof. Conduct, rule 1.18; Mo. Rules Prof. Conduct, rule 4-1.18; Mont. Rules Prof. Conduct, rule 1.20; Neb. Rules Prof. Conduct, § 3-501.18; Nev. Rules Prof. Conduct, rule 1.18; N.H. Rules Prof. Conduct, rule 1.18; N.J. Rules Prof. Conduct, rule 1.18; N.M. Rules Prof. Conduct, rule 16-118; N.Y. Rules Prof. Conduct, rule 1.18; N.C. Rules Prof. Conduct, rule 1.18; Ohio Rules Prof. Conduct, rule 1.18; Okla. Stat. tit. 5, § Rule 1.18 (OSCN 2010) Appen. 3-A; Or. Rules Prof. Conduct, rule 1.18; Pa. Rules Prof. Conduct, rule 1.18; R.I. Rules Prof. Conduct, rule 1.18; S.C. Rules Prof. Conduct, rule 1.18; S.D. Rules Prof. Conduct, rule 1.18; Utah Rules Prof. Conduct, rule 1.18; Vt. Rules Prof. Conduct, rule 1.18; Wn. Rules Prof. Conduct, rule 1.18; Wis. Supreme Ct. Rules, rule 20:1.18; Wyo. Rules Prof. Conduct, rule 1.18.)

ABA modified rule 1.10 to permit the law firm to accept the representation if the disqualified lawyer is timely and adequately screened. (ABA Model Rules Prof. Conduct, rule 1.10(a)(2).) This change was made after the ABA Standing Committee on Ethics and Professional Responsibility had inquired of states permitting screening and learned that their experience demonstrated "that properly established screens are effective to protect confidentiality." (ABA Standing Com. on Ethics and Prof. Responsibility, Recommendation 109 (Feb. 16, 2009) p. 11.)

### (3) The State Bar's Consideration and Ultimate Rejection of a New Ethical Rule Illustrates the Growing Recognition of the Changing Reality

In September 2009, California's Commission for the Revision of the Rules of Professional Conduct circulated for public comment a proposed rule 1.10, which would govern discipline for imputed conflicts of interest (Former Proposed Rule 1.10). (Com. for the Revision of the Rules of Prof. Conduct, State Bar of Cal., Proposed Amendments to the Rules of Professional Conduct of the State Bar of Cal. (Discussion Draft, Sept. 2009) pp. 127–149.) Former Proposed Rule 1.10 was based on ABA Model Rules of Professional Conduct, rule 1.10.[23]

Former Proposed Rule 1.10 provided for imputed conflicts of interest, without adopting the model rule's exception for screening. However, the introduction to the draft proposed rule indicated, "the Commission is equally divided on the issue of permitting screening in limited situations to facilitate the mobility of lawyers who were only peripherally involved in the matter. [Citation.] The Commission is interested in receiving input from the public and the profession on this issue and will specifically solicit public comment on whether California should sanction any kind of non-consensual ethical screening." (Com. for the Revision of the Rules of Prof. Conduct, State Bar of Cal., Proposed Amendments to the Rules of Professional Conduct of the State Bar of Cal. (Discussion Draft, Sept. 2009) p. 129.)

---

[23] California is currently considering the adoption of a rule, based on ABA Model Rules of Professional Conduct, rule 1.18, which would permit ethical screening in the circumstance where confidential information was obtained from a prospective client, as long as the attorney took reasonable measures to avoid exposure to more information than was reasonably necessary to determine whether to represent the prospective client. (Com. for the Revision of the Rules of Prof. Conduct, State Bar of Cal., Proposed Amendments to the Rules of Professional Conduct of the State Bar of Cal. (Discussion Draft, Jan. 2010) p. 147.) However, there is disagreement within the commission over whether such screening should be permitted. (Id. at pp. 145–146.)

"After initial public comment distribution, the Commission recommended adoption of a modified version of Model Rule 1.10 that would have permitted, in limited circumstances [those in which the attorney had not 'substantially participated' in the prior representation], the screening of a lawyer who moves from one private firm to another. However, a minority of the Commission took the position that no rule which provides that an ethical wall could effectively rebut the presumption of shared confidences in context of a lawyer moving from one private firm to another should be adopted. The Board of Governors Committee on Regulation and Admissions considered the Commission's recommendation (including the view of the Commission minority) at its March 5, 2010 meeting and the Board Committee determined not to recommend that the Board [of Governors] adopt any part of the proposed rule, including that part of the rule which addressed the concept of imputation of one lawyer's prohibition to other members in the firm. As to the screening provision, the Board Committee observed that the concept of ethical walls, in the context of lateral attorney movement from one private law firm to another, was an unsettled issue in California. As to the provisions concerning imputation, the Board concluded that the concept of imputation is well-settled in California case law and that a Rule of Professional Conduct was not necessary. In accordance with the Board Committee's action, a California version of Model Rule 1.10 is not being recommended for adoption." (Com. for the Revision of the Rules of Professional Conduct, State Bar of Cal., Rules and Concepts that were Considered, but are Not Recommended for Adoption (Mar. 2010) p. 11, fn. omitted <http://www.calbar.ca.gov/calbar/pdfs/ethics/RPC/RRCPubComConceptsConsideredRejected.pdf> [as of Apr. 7, 2010].)

We agree with the board of governors that the issue of whether attorney screening can overcome vicarious disqualification in the context of an attorney moving between private law firms is not clearly settled in California law. We find it significant, however, that a majority of the Commission for the Revision of the Rules of Professional Conduct believed that screening *should* be ethically permissible in limited circumstances.

 b. *California's Experience in Other Contexts Suggests That*
 *Ethical Screening in Private Law Firms Can Be Effective*

It is undisputed that the presumption of imputed knowledge is uniformly rebuttable and may be overcome by a proper ethical screen when the issue arises in the context of government and former government attorneys.[24] (*In re*

---

[24] In cases of a tainted attorney working in a government office, the courts have concluded the following policy considerations justify the use of only a rebuttable presumption of imputed knowledge: (1) public sector attorneys do not have a financial interest in the matters on which they work, so have less of an incentive than private attorneys to breach client confidences;

*Charlisse C.* (2008) 45 Cal.4th 145, 162 [84 Cal.Rptr.3d 597, 194 P.3d 330]; *Chambers v. Superior Court, supra,* 121 Cal.App.3d at pp. 902–903.) Yet if ethical screening can, in any given case, be considered effective to screen a former government attorney in a private law firm, it gives rise to the question why screening cannot be equally effective to screen a private attorney in the same private law firm. The effectiveness of the screening process depends on the policies implemented by the law firm, not on the former employment of the screened attorney.[25]

There is another context in which a rebuttable presumption of imputed knowledge—and therefore, the use of ethical screens—has been adopted, that of the tainted *nonattorney employee*. When a tainted nonattorney employee of a law firm, possessing confidential case information, moves to an opposing law firm, vicarious disqualification of the opposing law firm is not necessary if the employee is effectively screened. (*In re Complex Asbestos Litigation, supra,* 232 Cal.App.3d at pp. 579, 593, 596.) The same rule applies to a nonretained expert, who is then employed by the opposing side.[26] (*Shadow Traffic Network v. Superior Court* (1994) 24 Cal.App.4th 1067, 1084–1085 [29 Cal.Rptr.2d 693].) Indeed, a rebuttable presumption applies *within an expert firm*, allowing an expert firm to ethically screen an expert who interviewed with a plaintiff from an expert retained by the defendant in the same matter. (*Western Digital Corp. v. Superior Court* (1998) 60 Cal.App.4th 1471, 1485 [71 Cal.Rptr.2d 179].)

---

(2) public sector attorneys do not recruit clients or accept fees, so have no financial incentive to favor one client over another; (3) disqualification increases the costs for public entities, raising the possibility that litigation decisions will be driven by financial considerations rather than the public interest; and (4) automatic vicarious disqualification will restrict the government's ability to hire attorneys with relevant private sector experience. (*City of Santa Barbara v. Superior Court, supra,* 122 Cal.App.4th at pp. 24–25.) We note that, except for the last consideration, none of the other three could possibly apply in the context of a *former* government attorney working in a *private* law firm. Nonetheless, courts have not hesitated to apply only a rebuttable presumption of imputed knowledge in those cases as well. (*Chambers v. Superior Court, supra,* 121 Cal.App.3d at pp. 898–901.)

[25] We note that Cohen is a former government attorney. The law cannot possibly be that Sonnenschein could effectively screen Cohen if he was tainted from information obtained when he worked for the Department of Insurance, but cannot effectively screen him if he was tainted from information obtained when he worked for Fireman's Fund.

[26] For this reason, First American suggests that the rebuttable presumption of imputed knowledge should apply in this case, as Cohen allegedly had been interviewed by plaintiffs' counsel as a *consultant*, not as an *attorney*. This argument appears to have been impliedly foreclosed by the Supreme Court in *SpeeDee Oil*. There, the "of counsel" attorney was to have been "retain[ed] as a consultant." (*SpeeDee Oil, supra,* 20 Cal.4th at p. 1141.) Nonetheless, the Supreme Court concluded that the "of counsel" attorney had formed an attorney-client relationship, and applied the ethical rules governing attorneys to the situation. (*Id.* at pp. 1148, 1152; see also Vapnek et al., Cal. Practice Guide: Professional Responsibility (The Rutter Group 2009) ¶ 3:81, p. 3-33 (rev. # 1, 2009) [hiring an attorney as a consultant to give advice with respect to a particular client may create an attorney-client relationship between the consultant attorney and the hiring attorney and/or the client].)

In all of these situations—government employees, former government employees, nonattorney employees, experts, and expert firms—the presumption of imputed knowledge is rebuttable, not conclusive. Moreover, the use of a rebuttable presumption is not justified as a "necessary evil" in order to advance important policy considerations. Instead, the rebuttable presumption is accepted because it is believed that, under the proper circumstances, ethical screening can work. There is no legitimate reason to believe that the same screening could not work in the context of private attorneys at a private firm. For example, in *City of Santa Barbara v. Superior Court, supra*, 122 Cal.App.4th at page 27, the court upheld an ethical wall in a government office, and stated, *"Like all attorneys,* [the tainted attorney] knows that her participation and use of confidential information against a former client would subject her to a host of problems including tort liability and state bar discipline. Such conduct would be a recipe for financial and professional suicide. We are confident that an attorney's oath and the severe consequences that would inexorably flow from a breach thereof, coupled with [an effective] 'ethical wall,' are sufficient to safeguard the former clients' confidences and preserve the integrity of the judicial process." (Italics added.) We agree. These same considerations, and a proper ethical wall, can also be sufficient in the case of a tainted private attorney at a private firm.

### c. *Policy Considerations*

Plaintiffs argue that there should be an irrebuttable presumption of imputed knowledge and automatic disqualification in order to "preserve public trust in the scrupulous administration of justice and the integrity of the bar."[27] (*SpeeDee Oil, supra*, 20 Cal.4th at p. 1145.) We agree that preservation of the public trust is a policy consideration of the highest order. However, it is *just one* of the many policy interests which must be balanced by a trial court considering a disqualification motion, and we are not prepared to say that this interest *always* outweighs the opposing party's right to counsel of its choice. We reiterate the policy considerations to be taken into consideration in a motion for disqualification: (1) a client's right to chosen counsel; (2) an attorney's interest in representing a client; (3) the financial burden on a client to replace disqualified counsel; (4) the possibility that

---

[27] Additionally, amici curiae in support of plaintiffs argue that even if an ethical wall may be factually effective, the presence of a tainted attorney at opposing counsel's firm gives rise to an appearance of impropriety which the courts should not countenance. California courts, however, are in agreement that the mere *appearance* of a conflict is not sufficient to justify disqualifying an attorney from a representation. (See *In re Jasmine S.* (2007) 153 Cal.App.4th 835, 843 [63 Cal.Rptr.3d 593]; *Hetos Investments, Ltd. v. Kurtin, supra*, 110 Cal.App.4th at p. 40; *Gregori v. Bank of America* (1989) 207 Cal.App.3d 291, 306–307 [254 Cal.Rptr. 853].)

tactical abuse underlies the disqualification motion;[28] (5) the need to maintain ethical standards of professional responsibility; and (6) the preservation of public trust in the scrupulous administration of justice and the integrity of the bar. (*SpeeDee Oil, supra*, 20 Cal.4th at pp. 1144–1145.)

In this regard, we find persuasive the following analysis of the ABA Standing Committee on Ethics and Professional Responsibility: "[F]raming the issue of imputation as a choice between client protection and lawyer mobility presents a false choice. Clients <u>must</u> be protected, and their confidence (as well as that of the public) in their lawyers' promise to keep their secrets must be preserved. The question is not *whether* but *how* that should be accomplished. No one contends that the lawyer himself may represent others against a former client on substantially related matters after moving to a new firm. [The model rules are] unequivocal on this subject. In addition, no one disputes that the confidentiality duty continues after termination of the client-lawyer relationship. If a lawyer breaches that duty, she is subject to discipline, whether she has changed firms or not. Screening is a mechanism to give effect to the duty of confidentiality, not a tool to undermine it." (ABA Standing Com. on Ethics and Prof. Responsibility, Recommendation 109 (Feb. 16, 2009) pp. 10–11, original italics.) The standing committee further noted, "Although much of the debate over lateral screening has been focused on the concerns of the clients of the lateral's former firm, there is a parallel set of interests: after a transferring lawyer has been hired, every imputed disqualification based on the unavailability of screening results in a client that loses its law firm of choice. The harm to all such clients is real, not theoretical. Often the disqualification of a firm, based upon an imputed conflict of a newly-hired lawyer, occurs after a matter is well under way and the affected client has spent substantial sums in fees. Typically, such clients have played no part in the circumstances that led to the imputed disqualification, yet they suffer the cost, disruption, and delay resulting from it. [¶] . . . Thus, clients have interests on both sides of the screening question. Screening does not solve all such problems, but reduces them to situations where the interests of the former clients cannot adequately be addressed by the screening mechanism." (*Id.* at pp. 11–12.)

---

[28] When setting forth these factors in *SpeeDee Oil*, the Supreme Court noted that two of the interests—possible tactical abuse in the bringing of the motion, and the financial burden on the client to replace disqualified counsel—were not present in the case before it. (*SpeeDee Oil, supra*, 20 Cal.4th at p. 1145, fn. 2.) The Supreme Court was careful to distinguish the case before it from cases where a party "attempt[s] to disrupt [the] case at a critical juncture" by belatedly moving for disqualification, or where a party "trie[s] to increase an opponent's litigation burdens by seeking disqualification only after the challenged counsel performed a substantial amount of work." (*Ibid.*) Accordingly, the Supreme Court stated that it was not expressing an opinion on "the relative weight these concerns might deserve in deciding a disqualification motion based on a conflict of interest." (*Ibid.*)

Courts have recognized the "interest in preserving the continuity of the lawyer-client relationship; otherwise, if such relationships were easily disrupted, complicated cases . . . would take even longer to resolve, the costs of litigation would be even higher, and unscrupulous attorneys would have an incentive to seize on strained facts and theories to pursue the tactical advantage of ousting their adversary's lawyers." (*UMG Recordings, Inc. v. MySpace, Inc., supra,* 526 F.Supp.2d at p. 1065; see also *In re Marriage of Zimmerman* (1993) 16 Cal.App.4th 556, 565 [20 Cal.Rptr.2d 132] [concerned with depriving a party of his counsel at a late stage in the proceedings].)

■ In short, the general policy concern of "client protection" is not merely the interest in protecting client confidences which would weigh in favor of vicarious disqualification in all cases. It is, instead, a two-fold concern, which also implicates the interest in protecting a client who has established a long-standing relationship with counsel, and is at risk of losing that attorney by means of vicarious disqualification, through no fault of the client (or the client's attorney). A properly established ethical screen can satisfy both concerns—protecting client confidences from being used against the client by the tainted attorney's new firm, while still protecting the opposing client's long-standing attorney-client relationship.

In the days prior to large law firms, when there was limited firm-to-firm mobility, the latter concern was rarely implicated in cases involving vicarious disqualification. Now, however, with the proliferation of multioffice "megafirms," frequent firm mergers, and attorneys increasingly changing firms throughout their careers, clients are at greater risk of finding their long-standing attorney-client relationships challenged due solely to their counsel's changing affiliations.

■ We hasten to add that we are not here attempting to effect a balancing of the policy interests in this case—this will be a matter for the trial court on remand. We do conclude, however, that, in certain cases, the public trust in the scrupulous administration of justice is not advanced (and, in fact, may be undermined) by an order disqualifying a party's long-term counsel due to the presence of another attorney in a different office of the same firm, who possesses only a small amount of potentially relevant confidential information, *and* has been *effectively* screened.

### 5. *The Elements of an Effective Screen*

■ Once the moving party in a motion for disqualification has established that an attorney is tainted with confidential information, a rebuttable presumption arises that the attorney shared that information with the attorney's

law firm.[29] The burden then shifts to the challenged law firm to establish "that the practical effect of formal screening has been achieved. The showing must satisfy the trial court that the [tainted attorney] has not had and will not have any involvement with the litigation, or any communication with attorneys or []employees concerning the litigation, that would support a reasonable inference that the information has been used or disclosed."[30] (*In re Complex Asbestos Litigation, supra,* 232 Cal.App.3d at p. 596.)

The specific elements of an effective screen will vary from case to case, although two elements are necessary: First, the screen must be timely imposed; a firm must impose screening measures when the conflict first arises.[31] It is not sufficient to wait until the trial court imposes screening measures as part of its order on the disqualification motion. (*Klein v. Superior Court, supra,* 198 Cal.App.3d at pp. 906, 913–914; see also *Hitachi, Ltd. v. Tatung Co.* (N.D.Cal. 2006) 419 F.Supp.2d 1158, 1165 ["The time to have moved the matter [to another office] would have been when the ethical conflict was discovered, not after losing a motion to disqualify."].) Second, it is not sufficient to simply produce declarations stating that confidential information was not conveyed or that the disqualified attorney did not work on the case; an effective wall involves the imposition of *preventive measures* to guarantee that information will not be conveyed. (*SpeeDee Oil, supra,* 20 Cal.4th at pp. 1142, 1151–1152 & fn. 5.) "To avoid inadvertent disclosures and to establish an evidentiary record, a memorandum should be circulated warning the legal staff to isolate the [tainted] individual from communications on the matter and to prevent access to the relevant files." (*In re Complex Asbestos Litigation, supra,* 232 Cal.App.3d at p. 594.)

"The typical elements of an ethical wall are: [(1)] physical, geographic, and departmental separation of attorneys; [(2)] prohibitions against and sanctions for discussing confidential matters; [(3)] established

---

[29] We reiterate, however, that the presumption is not rebuttable in those cases that fall within the *Henriksen* and *Meza* exception.

[30] As California's Commission for the Revision of the Rules of Professional Conduct is proposing a rule which would permit screening when confidential information was obtained from a prospective client, the commission is recommending a definition of the term "screened." According to the proposed rule, " 'Screened' means the isolation of a lawyer from any participation in a matter, including the timely imposition of procedures within a firm that are *adequate under the circumstances* (i) to protect information that the isolated lawyer is obligated to protect under these Rules or other law; and (ii) to protect against other law firm lawyers and non-lawyer personnel communicating with the lawyer with respect to the matter." (Com. for the Revision of the Rules of Prof. Conduct, State Bar of Cal., Proposed Amendments to the Rules of Professional Conduct of the State Bar of Cal. (Discussion Draft, Jan. 2010) p. 8, italics added.)

[31] "[S]creening should be implemented before undertaking the challenged representation or hiring the tainted individual." (*In re Complex Asbestos Litigation, supra,* 232 Cal.App.3d at p. 594.)

rules and procedures preventing access to confidential information and files; [(4)] procedures preventing a disqualified attorney from sharing in the profits from the representation; and [(5)] continuing education in professional responsibility." (*Henriksen, supra,* 11 Cal.App.4th at p. 116, fn. 6.) We briefly discuss the first four of these elements.[32] We stress, however, that the inquiry before a trial court considering the efficacy of any particular ethical wall is *not* to determine whether all of a prescribed list of elements (beyond timeliness and the imposition of prophylactic measures) have been established; it is, instead, a case-by-case inquiry focusing on whether the court is satisfied that the tainted attorney has not had and will not have any improper communication with others at the firm concerning the litigation.

■■■ The first factor—physical, geographic and departmental separation of attorneys—can also be described as "isolation." Isolation of the tainted attorney is the best way to prevent the *accidental* disclosure of confidential information. The rule of vicarious disqualification is based on the "everyday reality that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information." (*SpeeDee Oil, supra,* 20 Cal.4th at pp. 1153–1154.) Close proximity of attorneys "increases the actual risk of intentional or unintentional disclosure of [client] confidential information." (*Hitachi, Ltd. v. Tatung Co., supra,* 419 F.Supp.2d at p. 1165.) In a small practice group, separating the tainted attorney from the case alone might not be sufficient; separation from the attorneys handling the case can prevent inadvertent disclosure.[33] (*Ibid.*)

■■■ We turn to the second factor—prohibitions against the discussion of confidential information.[34] Such a prohibition is the primary goal of any ethical wall. In all but the most unusual case, it would be necessary for the

---

[32] We do not discuss "continuing education in professional responsibility," as California requires compliance with mandatory minimum continuing legal education requirements.

[33] Perhaps in recognition of the fact that Cohen worked with the First American team on the *Lyons* matter, First American argues that isolating the tainted attorney from *the matter from which he is disqualified* is sufficient, and that it is not necessary to isolate the tainted attorney from the other attorneys working on the matter. It cannot be determined, as a matter of law, whether, in all cases, complete isolation of the tainted attorney from the attorneys working on the matter from which the tainted attorney is disqualified *is* or *is not* necessary. We indicate only that isolation of the tainted attorney from the attorneys working on the matter would eliminate *any* possibility of the direct transmission of confidential information between the tainted attorney and the attorneys working on the matter. In some cases, particularly where the attorneys work closely together in a small office, complete isolation may be necessary to satisfy a court that the presumption of disclosure has been refuted.

[34] *Henriksen* suggests an ethical wall should also include "sanctions for discussing confidential matters." (*Henriksen, supra,* 11 Cal.App.4th at p. 116, fn. 6.) While we believe that a firm establishing an ethical wall does well to warn its attorneys and staff that violating the provisions of the ethical wall will have negative consequences—thereby demonstrating the firm's serious commitment to upholding the wall—we believe the idea of "sanctions for discussing confidential matters" may miss the point. If confidential matters are discussed in

challenged law firm to establish express prohibitions against the discussion of confidential information as part of its ethical wall. The purpose of an ethical wall is prophylactic; it seeks to prevent the sharing of client confidences which is otherwise assumed when attorneys are practicing together. An express prohibition against discussing the information which must not be discussed is a basic first step toward establishing this goal.

■ The third factor—established rules and procedures preventing access to confidential information and files—focuses on additional ways to prevent the accidental disclosure of confidential information. Files may be stored in a separate location to which the tainted attorney has no access. (*City of Santa Barbara v. Superior Court, supra*, 122 Cal.App.4th at p. 21.) Warnings can be posted on file room doors (*UMG Recordings, Inc. v. MySpace, Inc., supra*, 526 F.Supp.2d at p. 1052) or files may be protected by lock and key (see *In re Charlisse C., supra*, 45 Cal.4th at p. 155). Electronic documents can be coded with restrictions on access. (*UMG Recordings, Inc. v. MySpace, Inc., supra*, 526 F.Supp.2d at p. 1052.) As with the other factors, we do not hold that any particular method of preventing access to confidential information and files is necessary—indeed, a trial court might conclude that a simple directive not to access the information is sufficient. The more steps a firm has taken to prevent any disclosure, however, the more likely it is that a court will find the ethical wall to be sufficient.

■ The fourth factor is the establishment of procedures preventing a disqualified attorney from sharing in the profits from the representation. ABA Model Rules of Professional Conduct, rule 1.10(a)(2)(i) specifically provides that vicarious disqualification is not necessary when the disqualified lawyer is timely screened from participation in the matter "and is apportioned no part of the fee therefrom."[35] Comment 8 to that rule provides that it "does not prohibit the screened lawyer from receiving a salary or partnership share established by prior independent agreement, but that lawyer may not receive compensation directly related to the matter in which the lawyer is disqualified." The rationale is clear; if the disqualified attorney will not share in the profits of the representation, there is no financial incentive for the disqualified attorney to covertly assist the representation by improperly disclosing confidential information.

---

violation of the ethical wall, the firm may be subject to vicarious disqualification *regardless* of whether it sanctions the offending parties.

[35] California's proposed rule 1.18, allowing screening in certain situations when an attorney is disqualified due to having obtained confidential information from a prospective client, includes the same language. (Com. for the Revision of the Rules of Prof. Conduct, State Bar of Cal., Proposed Amendments to the Rules of Professional Conduct of the State Bar of Cal. (Discussion Draft, Jan. 2010) p. 147.)

An additional element favorably acknowledged in case law is that the disqualified attorney have no supervisory powers over the attorneys involved in the litigation, and vice versa. (*City of Santa Barbara v. Superior Court, supra*, 122 Cal.App.4th at p. 27.) This is similar to the factor discussed above, that the tainted attorney receive no compensation from the matter. If the attorneys handling the matter are *supervising* the tainted attorney, the tainted attorney may feel an obligation to assist the supervising attorneys in their representation. Likewise, if the tainted attorney is supervising the attorneys involved in the litigation, there could be concerns that the tainted attorney sets policies that might bear on the subordinates' handling of the litigation. (*City and County of San Francisco v. Cobra Solutions, Inc., supra*, 38 Cal.4th at p. 850, fn. 2.)

Although not discussed in the case law, we believe one additional factor, commonly noted in ethical rules governing imputed conflicts, should also be considered by trial courts in their analysis: notice to the former client.[36] ABA Model Rules of Professional Conduct, rule 1.10(a)(2), provides that, when a disqualified attorney is timely screened, "written notice [must be] promptly given to any affected former client to enable the former client to ascertain compliance with the provisions of this Rule, which shall include a description of the screening procedures employed; a statement of the firm's and of the screened lawyer's compliance with these Rules; a statement that review may be available before a tribunal; and an agreement by the firm to respond promptly to any written inquiries or objections by the former client about the screening procedures[.] [¶] [Additionally,] certifications of compliance with these Rules and with the screening procedures are [to be] provided to the former client by the screened lawyer and by a partner of the firm, at reasonable intervals upon the former client's written request and upon termination of the screening procedures." (See also Com. for the Revision of the Rules of Prof. Conduct, State Bar of Cal., Proposed Amendments to the Rules of Professional Conduct of the State Bar of Cal. (Discussion Draft, Jan. 2010) p. 147 [where Cal.'s proposed rule would permit screening when an attorney has obtained confidences from a prospective client, such screening is permitted only when "written notice is promptly given to the prospective client to enable the prospective client to ascertain compliance with the provisions of this Rule"].)

The reasons for providing notice to the former client should be obvious. Notice increases the public perception of the integrity of the bar, by making the interested party aware of the potential threat to its confidential information and the measures taken to prevent the improper use or disclosure of such

---

[36] As with the other elements, notice is not an element required in all cases in order for an ethical wall to rebut the presumption of imputed knowledge and prevent disqualification of the law firm.

information. Moreover, notice establishes an enforcement mechanism, in that the interested party will be able to suggest measures to strengthen the wall, and to challenge any apparent breaches. However, the interested party's *consent* is not required.

 We note that these are the "typical elements" of a wall. Each of these elements need not necessarily be present for an ethical wall to be sufficient to rebut the presumption of imputed knowledge. Any ethical wall must ultimately be judged by whether it is sufficient to meet its purpose: satisfying the trial court that the tainted attorney has not had and will not have any involvement with, or communication concerning, the litigation that would support a reasonable inference that confidential information was or will be disclosed.

### 6. The Trial Court Erred in Ruling Vicarious Disqualification Was Automatic

 In sum, we have concluded that, when a tainted attorney moves from one private law firm to another, the law gives rise to a rebuttable presumption of imputed knowledge to the law firm, which may be rebutted by evidence of effective ethical screening. However, if the tainted attorney was actually involved in the representation of the first client, and switches sides in the same case, no amount of screening will be sufficient, and the presumption of imputed knowledge is conclusive. (See *Meza, supra*, 176 Cal.App.4th at pp. 977–979; *Henriksen, supra*, 11 Cal.App.4th at pp. 114–115.)

 When considering a motion to disqualify a law firm on the basis of imputed knowledge in a case where the presumption is rebuttable, a trial court should consider, on a case-by-case basis, whether the ethical screening imposed by the firm is effective to prevent the transmission of confidential information from the tainted attorney. Moreover, the court should consider all of the policy interests implicated by the disqualification motion, in determining how to exercise its discretion. In this case, the trial court concluded that automatic vicarious disqualification was the rule; this was error.

However, the trial court also concluded that, even if ethical screening were permissible, the ethical screening wall in this case was breached and it was therefore ineffective. In reaching its conclusion that the wall was breached, however, the court relied on a factual determination that Cohen's work on the *Lyons* matter was used against plaintiffs in two of the related class actions. Substantial evidence does not support this conclusion. It is clear that Cohen performed work on the *Lyons* matter prior to the time the First American team cited to an order of the *Lyons* trial court in connection with its

demurrers in the related class actions. However, the record before us establishes that the *Lyons* order to which the First American team cited had been obtained prior to the First American team's move to Sonnenschein. Thus, there is no evidence that Cohen's work on the *Lyons* matter was used by the First American team in the related class actions. As the trial court relied on its finding to the contrary in order to support its conclusion that the ethical wall was ineffective in this case, and that finding is not supported by the record, the court's conclusion that the ethical wall was ineffective cannot stand.

We do not here decide that Cohen's work on the *Lyons* matter was or was not disqualifying of Sonnenschein. Clearly, the safest approach would have been for Sonnenschein to screen Cohen *completely* from the First American team and all First American cases. However, the fact remains that the screening wall Sonnenschein built prohibited Cohen from working on the related class actions, and no evidence that we have found in the record before us indicates that he did. Under normal circumstances, we would stop here and remand for the trial court to consider whether the provisions of Sonnenschein's ethical wall were *adequate* to rebut the presumption of imputed knowledge. The circumstances, however, have changed.

### 7. *Effect of Cohen's Departure from Sonnenschein*

On First American's motion, we have taken additional evidence on appeal. (Code Civ. Proc., § 909.) That evidence indicates that Cohen is no longer employed by Sonnenschein. This changes the inquiry the trial court is to make on remand.

The purpose of a disqualification order is prophylactic, not punitive. (*Gregori v. Bank of America, supra,* 207 Cal.App.3d at pp. 308–309.) That is, the issue is whether there is a genuine likelihood that allowing the attorney to remain on the case will affect the outcome of the proceedings before the court. (*Ibid.*) When considering vicarious disqualification of a firm based on the presence of a tainted attorney, the issue is whether there is a likelihood that other attorneys at the firm may receive and use the information possessed by the tainted attorney in the pending action.

However, once the tainted attorney has left the firm, vicarious disqualification is not necessary "where the evidence establishes that no one other than the departed attorney had any dealings with the client or obtained confidential information." (*Goldberg v. Warner/Chappell Music, Inc., supra,* 125 Cal.App.4th at p. 755.) Thus, the inquiry is no longer a prospective one, but a retrospective one. The trial court should not consider the *risk* of transmitting information from the tainted attorney to those involved in the challenged representation, but, instead, whether the tainted attorney *actually* conveyed

confidential information.[37] (*Goldberg*, at p. 762; cf. *Adams v. Aerojet-General Corp., supra*, 86 Cal.App.4th at p. 1335.) As part of its inquiry, however, the trial court may consider the elements of the ethical wall constructed by Sonnenschein, as the strength of the wall may well be relevant to a determination of whether it is likely that confidential information was actually conveyed.

In this case, Cohen was present at the Sonnenschein firm for approximately one year. On remand, the trial court must determine whether Cohen's activities at the firm actually resulted in the improper transmission, directly or indirectly, of confidential information from Cohen to the First American team, or any other member of the Sonnenschein firm who may have worked on the related class actions. If (1) the Sonnenschein firm can overcome the rebuttable presumption that confidential information was transmitted, by offering sufficient evidence that confidential information was not, in fact, transmitted;[38] and (2) the trial court, in the exercise of its discretion, concludes that the implicated policy considerations favor allowing Sonnenschein to remain as counsel, the trial court should deny the motion for disqualification. If, however, the trial court concludes that (1) Sonnenschein has not sufficiently rebutted the presumption that confidential information was transmitted, or (2) despite a finding that confidential information was not transmitted, the competing policy considerations nonetheless mandate disqualification of the entire firm under the circumstances, the trial court should grant the motion for disqualification. We express no opinion on the resolution of any of these questions, which are for the trial court to determine in the first instance.

---

[37] Our opinion in *Meza, supra*, 176 Cal.App.4th at page 979 is not to the contrary. There, we concluded that the trial court did not abuse its discretion in disqualifying the law firm representing a plaintiff even though the tainted attorney had left the law firm before the disqualification motion was granted. In that case, however, the plaintiff's law firm had been fully aware that it was hiring an attorney who had represented a defendant in the same action. Indeed, the plaintiff's firm had been aware that the attorney had shared confidences with counsel representing other defendants in the matter pursuant to a joint defense agreement. (*Ibid.*) In those circumstances, we held that the trial court could have properly concluded "that allowing the [plaintiff's] firm to represent [plaintiff] would undermine California's policy in favor of protecting attorney work product, its own [case management order permitting defendants' counsel to share confidences without waiving the work product privilege], and the integrity and fairness of the proceedings." (*Ibid.*) Such egregious circumstances are not present in the instant case.

[38] In this regard, we note that Sonnenschein did not provide declarations of all members of the First American team, or a declaration from John Koski, the Sonnenschein partner who established the ethical wall after a "private discussion" with Cohen. Clearly, every Sonnenschein attorney who worked on the related class actions, as well as any other member of the Sonnenschein firm with whom Cohen is claimed to have had reason or occasion to discuss information obtained from plaintiffs' counsel, should provide testimonial evidence. (*SpeeDee Oil, supra*, 20 Cal.4th at p. 1152, fn. 5.)

## DISPOSITION

The order of disqualification of the Sonnenschein firm is reversed. The matter is remanded to the trial court for further proceedings not inconsistent with the views expressed herein. Each party shall pay its own costs on appeal.

Klein, P. J., and Kitching, J., concurred.

On May 6, 2010, the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied June 23, 2010, S182775. Chin, J., was of the opinion that the petition should be granted.