Filed 6/26/18; Certified for publication 7/24/18 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| FLUIDMASTER, INC., | |
| Plaintiff and Respondent, | G055469 |
| v. | (Super. Ct. No. JCCP 4829) |
| FIREMAN'S FUND INSURANCE COMPANY et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from an order of the Superior Court of Orange County, Glenda Sanders, Judge.  Reversed and remanded.

Grignon Law Firm and Margaret M. Grignon for Defendants and Appellants.

Pillsbury Winthrop Shaw Pittman, Robert L. Wallan and Mariah L. Brandt for Plaintiff and Respondent.

# I.  INTRODUCTION

The law firm of Crowell & Moring (Crowell) was vicariously disqualified from this insurance coverage action based on a newly-hired, but disqualified discovery associate in a geographically distant office.  Then, while the disqualification appeal was pending in this court, the associate left Crowell.  At that point, *Kirk v. First American Title Ins. Co.* (2010) 183 Cal.App.4th 776 (*Kirk*) became the controlling authority.  *Kirk* also involved a disqualified attorney who left a vicariously disqualified law firm during the pendency of an appeal, and the result was that the order of disqualification had to be reversed and remanded back for reconsideration by the trial court.  In the process *Kirk* outlined a number of factors that controlled the case on remand with regard to the efficacy of what is called an ethical screen in retroactively deciding whether any of a former client's confidential communications had been actually disclosed.  We now follow *Kirk* and reverse the disqualification order and return the case to the trial court with directions to reevaluate its disqualification decision in light of *Kirk* – specifically the *Kirk* factors as to whether any confidential information has actually been disclosed.

# II.  FACTS

Fluidmaster, Inc. is a major plumbing supply company alleged to have manufactured defective flexible toilet connectors.  The defective product allegation has generated a large number of class actions against the company.  (See generally *In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.* (N.D. Ill., Mar. 31, 2017, No. 14-cv-5696) 2017 U.S. Dist. LEXIS 48792.)

Fireman's Fund is an insurance company that has paid homeowner claims based on Fluidmaster's allegedly defective product and has sued Fluidmaster in subrogation to recover the monies paid.  Fireman's Fund issued commercial liability insurance policies to Fluidmaster from 1999 through 2001.

2

In October 2014, Fluidmaster sued Fireman's Fund in Los Angeles seeking to establish, in an insurance coverage case, that Fireman's Fund owed Fluidmaster a defense of the class actions. About a year later, in 2015, the case was transferred to Orange County and Fireman's Fund retained Crowell's Irvine office to represent it.

Elizabeth Pollock is an especially computer-savvy attorney. In 2008, she began working for a technology services company specializing in helping law firms and businesses with electronic discovery needs, and in January 2013, moved to another such company, E-STET. Pollock worked at E-STET from 2013 through January 2016 as Director of Managed Review.

In 2014, Fluidmaster hired E-STET to help it with the discovery in the class actions. That discovery entailed production of some 140,000 pages (not a misprint) of Fluidmaster documents, plus the withholding of another 10,000 pages of documents claimed by Fluidmaster to be privileged. Pollock was E-STET's lead on the project, but in January 2016, she found other employment.

She changed jobs again in July 2017. She began working for Crowell's Los Angeles office as a "discovery attorney." The backstory of her hiring, according to her later declaration, is that she was approached by an outside recruiter in March and asked "extensively about potential conflicts" by a recruiting lawyer at Crowell in April. In late April she completed a questionnaire about past employment and identified four companies that had engaged one of her previous employers. One was Fluidmaster. She was then contacted by Crowell's professional responsibility "counsels" (two attorneys at Crowell) but did not volunteer – and was not asked about – "any facts or communications regarding Fluidmaster that would be considered confidential." On the day she began work for Crowell, the firm sent out an "ethics wall notice" to all personnel prohibiting any communication with her on the Fluidmaster plumbing products litigation, and specifically prohibiting attorneys working on the Fluidmaster litigation from using her

3

services.[1]  Crowell also sent a courtesy letter to Fluidmaster's general counsel to notify them of Pollock's hiring and the ethical screen.

Fluidmaster almost immediately – and successfully – sought disqualification of the entire Crowell firm.  In September 2017, the trial court ordered Crowell disqualified but specifically noted that "Ms. Pollock's presence at C&M is still very evident in this case" and on that basis distinguished *Kirk*.  Wrote the trial judge:  "[t]he *Kirk* court was influenced by the fact that the tainted attorney had left the law firm sought to be disqualified which, again, is not the case here."

Fireman's Fund and Crowell filed this appeal.  The coverage litigation was put on hold.

Then, in February 2018, during the pendency of this appeal, Pollock left Crowell.  Appellants' counsel made a motion for this court to take evidence to establish the fact of her discontinued employment, this court granted it and then asked for further briefing on the effect of Pollock's leaving Crowell on the order of disqualification.  In particular, we asked whether there was any evidence before the trial court on the disqualification motion that showed Pollock had shared any of Fluidmaster's confidential information with any person at Crowell.  In its letter brief Fluidmaster concedes there was no such evidence.

---

[1]     The ethics wall notice said:  "Elizabeth Pollock, previously an employee with E-STET Litigation Services ("E-STET"), recently joined Crowell & Moring as a discovery attorney. At E-STET, Ms. Pollock assisted Fluidmaster Inc. with e-discovery issues in connection with class action consumer litigation related to plumbing products ("E-STET Matter"). Crowell & Moring has been retained by FFIC to represent it in connection with insurance coverage claims related the class action consumer litigation related to plumbing products (CAM 102923.0000302) ("C&M Matter").

"Ms. Pollock has an ongoing obligation prohibiting any communication of confidential information regarding the E-STET Matter, as is true with all former clients. In addition, an ethics wall is being put in place to ensure that Ms. Pollock does not participate in the firm's representation of FFIC in the C&M Matter and does not communicate any confidential information regarding the E-STET Matter to those individuals employed by Crowell & Moring representing FFIC in the C&M Matter.

"Accordingly, Ms. Pollock is prohibited from discussing or providing access to information concerning the E-STET Matter to the FFIC Attorneys and the FFIC Attorneys are prohibited from using Ms. Pollock's services on the C&M Matter and from discussing information with Ms. Pollock concerning the E-STET Matter or the C&M Matter."

4

III. DISCUSSION

We will assume, without deciding, that Pollock is conflicted out of representing Fireman's Fund in the coverage litigation brought by Fluidmaster. There is no question there was a substantial relationship between her work for E-STET on Fluidmaster's behalf, and the Crowell firm's work on Fireman's Fund's behalf against Fluidmaster.[2]

But this appeal is about the vicarious disqualification of a 500-plus attorney firm. It is safe to say that *Kirk* is by far the most thoughtful and well researched California appellate opinion on the topic of California law in regard to the topic of the vicarious disqualification of an entire law firm based on the employment of one disqualified attorney.[3] The *Kirk* opinion is a long one. Even so, it is, as the critics say, a worthwhile "read."

The facts in *Kirk* require a brief abstraction: The chief counsel of a major insurance company (Fireman's Fund, no less) was contacted by the lawyers for the plaintiffs who were litigating against another, First American Title. The lawyers wanted to hire the chief counsel away to help them in their litigation against the title insurer. In a phone call, the chief counsel was undisputedly given confidential information regarding the ongoing litigation against the title insurer. But he turned them down, and later joined

---

[2] There are at least two obvious areas of direct conflict. First, as a person making an initial determination whether a given Fluidmaster document was privileged, Pollock would necessarily have been privy to communications between Fluidmaster and its attorneys on the class actions. Second, in the coverage litigation, there is the issue of whether the attorney fees and costs spent by Fluidmaster on its defense of the class action were reasonable. Pollock would necessarily have insight into both issues from her work as document reviewer for E-STET on the class action litigation.

[3] The idea of automatic vicarious disqualification worked its way into California case law in a couple of California appellate decisions that took the rule for granted, which themselves can traced back to a number of federal decisions that also took the rule for granted. (See *Henriksen v. Great American Savings & Loan* (1992) 11 Cal.App.4th 109; *Dill v. Superior Court* (1984) 158 Cal.App.3d 301; *Trone v. Smith* (9th Cir. 1980) 621 F.2d 994; *Government of India v. Cook Industries Inc.* (2d Cir. 1978) 569 F.2d 737, 739-740 and *NCK Organization, Ltd. v. Bregman* (2d Cir. 1976) 542 F.2d 128, 132-134.) The correctness of the rule is not at issue here.

5

the San Francisco office of a mega-firm in its insurance regulatory practices group.[4]  But about a month after joining the mega-firm, the team defending the title insurer in the ongoing litigation moved to that mega-firm – one lawyer went to the mega-firm's Los Angeles office and the two others to its St. Louis office.   The defense of the ongoing litigation against the title insurer went with them, that is, the title insurer's law firm was now the mega-firm.  And almost as soon as the lawyers for the plaintiffs in the litigation against the title insurer learned of the move, they objected to the mega-firm's now being counsel on the case.  (See *Kirk, supra*, 183 Cal.App.4th at pp. 785-788.)

There was no question the former chief counsel himself was disqualified from working on the mega-firm's defense of the title insurer; the issue was whether the entire mega-firm had to be disqualified, too.  The trial court applied an automatic rule of vicarious disqualification (*Kirk, supra*, 183 Cal.App.4th at p. 790).  The case then went up on appeal.   And – just like the case here – during the appeal the disqualified (now former) chief counsel left the mega-firm.  (*Id*. at 815.)

The *Kirk* court held the case had to be returned for reconsideration.  Structurally, *Kirk* is really two separate opinions:  (1) a major disquisition on the topic of vicarious disqualification which appears to have been prepared prior to the court's receiving the news that the disqualified attorney had left the mega-firm; and (2) a secondary opinion exploring the issue of the disqualified attorney's leaving the target mega-firm during the pendency of the appeal.

The major disquisition has three parts:  The first part is a scholarly demonstration that the California Supreme Court had not laid down a rule of automatic vicarious disqualification, so the question was still open as a matter of stare decisis.  The second part explained why vicarious disqualification should not be an automatic rule

---

4        The firm was Sonnenschein Nath & Rosenthal.  The chief counsel had worked in the general counsel's office of the California Department of Insurance prior to going to Fireman's Fund.

6

when an ethical screen is imposed around the disqualified attorney, but should be a matter of case-by-case application. (See *Kirk, supra*, 183 Cal.App.4th at pp. 801-810.) The third part is an exploration of those factors that bear on whether an ethical screen will be effective. (*Id*. at pp. 810-815.)

The secondary opinion confronted the question of what to do in light of the news of the former chief counsel's departure from the mega-firm. The conclusion was that the case had to go back to the trial court for an examination of whether the chief counsel had *actually* conveyed any of the title insurer's confidential information during his one-year tenure at the mega-firm. (See *Kirk, supra*, 183 Cal.App.4th at pp. 815-816.)

Given the posture of our case, we derive the most guidance from *Kirk's* secondary opinion as it relates to disqualified counsel departing the target firm. There is one difference in the cases, but it weighs in Crowell's favor at this juncture. In *Kirk*, the trial court had applied a rule of automatic exclusion, laboring under a misimpression of what stare decisis required, so the case *had* to be remanded for a determination by the trial court in the first instance. (See *Kirk, supra*, 183 Cal.App.4th at p. 815.) In the present case, by contrast, the trial court did not believe automatic vicarious disqualification was required; it simply thought that, given Pollock's continued employment at Crowell, the balancing of factors augured against the efficacy of Crowell's ethical screen. But, as Fluidmaster's letter brief concedes – there was no evidence Pollock had actually shared any confidences. While that fact had been unnecessary to the trial court's decision in *Kirk*, here the trial court made its decision *despite* the lack of any evidence of divulgence of former client confidences.

The difference is important because the *Kirk* court explained that once a disqualified attorney leaves the target firm, the only real question is whether any confidences were shared with the target firm. (See *Kirk, supra*, 183 Cal.App.4th at pp. 815-816.) For us, the question is whether the lack of evidence at the original hearing of

7

any shared confidences means the case should be returned with directions to vacate the disqualification order outright and reinstate counsel – because of the absence of any evidence of any disclosure of Fluidmaster confidential information at the original hearing – or simply send it back for reconsideration.

We think the case should be sent back for reevaluation by the trial court. Disqualification relates to the trial court's authority to control its own proceedings. (See *Kirk, supra*, 183 Cal.App.4th at p. 791, quoting *SpeeDee Oil, supra*, 20 Cal.4th at p. 1145.) Here, the trial court did not know of the disqualified attorney's departure at the time of its original order. In fact, the court distinguished *Kirk* on the basis that the disqualified attorney had not departed when it made its order in September 2017.

Furthermore, the record is silent as to whether any confidences might have been spilled during the roughly six months Pollock was at Crowell. The *Kirk* court opined that the target law firm needs to provide declarations sufficient to exclude any possibility of shared confidences – the declaration of the disqualified attorney is not sufficient. The court said the target firm should, at the very least, provide declarations from each member of its team working on the former client's matter, plus those attorneys (usually on the professional responsibility unit of a large firm) who learned of the facts that prompted the erection of the ethical screen in the first place. (See *Kirk, supra*, 183 Cal.App.4th at p. 816, fn. 38.)

The case must therefore be returned for the retroactive evaluation of any possible sharing. In that regard, the *Kirk* court said the trial court "may consider the elements of the ethical wall constructed" by the target firm as "relevant" to the "strength" of wall and the likelihood "confidential information was actually conveyed." (*Kirk, supra*, 183 Cal.App.4th at p. 816.)

For the guidance of the trial court on remand, we now recount the factors from the *Kirk* opinion that bear on evaluating the retroactive "strength" of the ethical

wall. While the first one was not specifically enumerated in *Kirk* as its own separate factor, we include it because it undergirds much of the *Kirk* opinion, and in particular *Kirk's* rejection of automatic vicarious disqualification:

(1) *Size, or lack thereof.* An overarching factor is the size of the target firm. (See *Kirk, supra*, 183 Cal.App.4th at pp. 801-802.) The large law firm of the early 21st Century can effectively isolate a disqualified lawyer from its attorneys working on the disqualified attorney's former client's matter. (See *id.* at p. 802, quoting *Adams v. Aerojet-General Corp.* (2001) 86 Cal.App.4th 1324, 1336.) Conversely, the smaller the firm, the stronger the case for a rule of vicarious disqualification, if only because in such a context "it takes no imagination" to perceive the ease by which a former client's confidences might be disclosed.[5]

(2) *The geographical, physical and departmental distance between the disqualified attorney and the attorneys working on matters affecting the disqualified attorney's former client.* (See *Kirk, supra*, 183 Cal.App.4th at p. 811.)

(3) *The nature, if any, of the target law firm's prohibitions against the discussion of confidential information.* (See *Kirk, supra*, 183 Cal.App.4th at pp. 811-812.)

(4) *The existence, if any, of rules and procedures to prevent access to confidential information and files.* (See *Kirk, supra*, 183 Cal.App.4th at p. 812.)

---

[5] One of the most perceptive defenses of the imputed knowledge rationale is to be found in Justice Scotland's dissent in *Adams*. We might call it the "it takes no imagination" theory of vicarious disqualification. Significantly, it is a defense of the rule based on the small size of the firm involved in the *Adams* case: "It is inconceivable that, *in such a small firm with only three partners, there would not have been discussions among all the attorneys, particularly the partners, about material matters relating to the representation of a major, sustaining client like Aerojet.* It takes no imagination to recognize that confidential information which would be useful to someone later suing Aerojet normally would be imparted during discussions about billing matters or billing rates, during casual conversations at social occasions with Aerojet principals, or in the many other types of contacts among attorneys in the firm that would not constitute direct representation and would not show up on billing records. *The client was too big, the firm too small, and the matters at issue too closely* related to say there is no conflict." (*Adams, supra*, 86 Cal.App.4th at pp. 1344-1345 (dis. opn. of Scotland, J., italics added).)

9

(5) *Whether the disqualified attorney has some financial incentive in regard to the representation against the former client.* (See *Kirk, supra*, 183 Cal.App.4th at p. 812.)

(6) *The existence if any of any supervisorial relationship between the disqualified attorney and the attorneys working on any former client matters.* (See *Kirk, supra*, 183 Cal.App.4th at p. 813.)

(7) *The speed with which the former client was notified of the target firm's employment of the disqualified attorney.* (See *Kirk, supra*, 183 Cal.App.4th at p. 813.)

Fluidmaster argues *Kirk* does not compel a remand because the trial court here has already found a conflict existed, so the employee's departure would not change the result. The sole support for this contention is the trial court's reference to the Crowell firm's not having "maintained . . . a cone of silence." The reference to "cone of silence" is based on a passage in the trial court's 16-page ("Smartly" written) September 2017 opinion, on the disqualification motion.

Fluidmaster reads too much into the cone of silence reference. In context, all the cone of silence passage shows is that Pollock had conversations with Crowell attorneys "about" the Fluidmaster litigation *prior* to being hired – conversations presumptively necessary to a proper conflicts check. [6] We see nothing wrong with that. What was Pollock to do? *Not* disclose the fact that she had worked for a firm that had been employed by Fluidmaster? What was Crowell to do? *Not* disclose sufficient information to let Pollock know she would need to be screened off from one of the

---

[6] Here is the passage, verbatim: "The *Complex Asbestos* Court held that most likely means of rebutting the presumption of shared confidences is to implement a procedure which effectively screens the employee from any involvement in the litigation, 'a procedure one court aptly described as a "cone of silence." *Id* at 593. No such 'cone of silence' has been imposed here as evidenced by [Pollock's] declaration and the fact she had conversations with attorneys at C&M which she and they profess did not cover 'confidential' matters but which apparently did pertain to the litigation in general." The allusion to the *Complex Asbestos* court is to *In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572.

firm's cases?  Prospective hiree and hirer must at least share enough information about past and current work to ascertain, evaluate, and remediate potential conflicts.  Further, based on the ethical screen memo sent out the day Pollock was hired, the Crowell firm *did* impose a cone of silence on any of its attorneys talking about what she learned about Fluidmaster at E-STET with her.  ("Ms. Pollock is prohibited from discussing or providing access to information concerning the E-STET Matter to the FFIC Attorneys and the FFIC Attorneys are prohibited from using Ms. Pollock's services on the C&M Matter and from discussing information with Ms. Pollock concerning the E-STET Matter or the C&M Matter.")

Likewise, Fluidmaster reads too much into the trial court's decision generally.  The trial judge's statement of decision focused on whether, under the circumstances presented, Crowell's ethical screen was strong enough.  That was a legal determination, not a factual finding.  On remand, of course, the court will have a chance to review the strength of the ethical screen in light of the *Kirk* factors we have outlined above.  More specifically, this time the court will have the opportunity to focus *retroactively*, as *Kirk* teaches, on the question of whether Pollock's stay at Crowell "actually resulted in the improper transmission, directly or indirectly, of confidential information[.]"  (See *Kirk, supra*, at p. 816.)

11

## IV.  DISPOSITION

The order disqualifying the Crowell firm from the Fluidmaster-Fireman's Fund litigation is reversed, and the matter hereby remanded for a new hearing at which the trial court will reweigh the competing considerations.  Each side will bear its own costs on appeal.

BEDSWORTH, ACTING P. J.

WE CONCUR:

ARONSON, J.

GOETHALS, J.

12

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| FLUIDMASTER, INC., | |
| Plaintiff and Respondent, | G055469 |
| v. | (Super. Ct. No. JCCP 4829) |
| FIREMAN'S FUND INSURANCE COMPANY et al., | ORDER GRANTING REQUEST FOR PUBLICATION |
| Defendants and Appellants. | |

Appellants have requested that our opinion in this matter, filed June 26, 2018, be certified for publication. After reviewing the request, we have concluded the case meets the requirements for publication. Pursuant to California Rules of Court, rule 8.1105(b), (c)(3) and (5), the request is GRANTED.

The opinion is ordered published in the Official Reports.



                                          BEDSWORTH, ACTING P. J.


WE CONCUR:



ARONSON, J.



GOETHALS, J.



2