Filed 6/24/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| MUNGER HORTIFRUT NORTH AMERICA, LLC., | F088396 |
| Plaintiff and Appellant, | (Super. Ct. No. BCV-20-100048) |
| v. | |
| DAN DRAKE ENTERPRISES, LLC, et al., | **OPINION** |
| Defendants and Respondents. | |

-ooOoo-

APPEAL from an order of the Superior Court of Kern County.  Bernard C. Barmann, Jr., Judge.

Sagaser Watkins & Wieland, Charles P. Hamamjian, Howard A. Sagaser, Daniella M. Crisanti and Samantha M. Kandarian for Plaintiff and Appellant.

Borton Petrini, Rosemarie S. Lewis, Michael J. Stump; Alexander & Assoc. and William L. Alexander for Defendant and Respondent Dan Drake Enterprises, LLC.

Horvitz & Levy, Robert H. Wright, Gaspard Rappoport; Lewis Brisbois Bisgaard & Smith, Joseph A. Salazar and Ryan Matthews for Defendant and Respondent Jim's Supply Company, Inc.

-ooOoo-

Appellant Munger Hortifrut North America, LLC (Munger) appeals from a trial court order denying its motion to disqualify Borton Petrini, LLP (Borton Petrini) from representing respondent Dan Drake Enterprises, LLC (Dan Drake) in litigation between Munger and Dan Drake.[1] The disqualification motion was triggered by an associate attorney, Lisa Horton, moving from Munger's counsel, Sagaser, Watkins & Wieland, PC (Sagaser), to Borton Petrini. Borton Petrini responded to Munger's concerns, in part, by firing Horton. Not satisfied that its confidential client information was properly protected by this move, Munger filed the disqualification motion. When the motion was denied, Munger filed both a writ petition and an appeal. When the writ petition was denied, Munger continued with the appeal. For the reasons set forth below, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2023, Munger and Dan Drake were engaged in ongoing litigation in Bakersfield (the Munger litigation). The litigation began in 2020 and was scheduled for trial in September 2024. Munger was represented by Sagaser, and Dan Drake was represented by Borton Petrini. Munger's primary counsel was Charles Hamamjian, based in Fresno. Dan Drake's primary counsel was Michael Stump, based in Bakersfield.

During this time, Horton was an attorney working for Sagaser in their Fresno office. In July 2023 and again in January 2024, Hamamjian requested Horton handle depositions in the Munger litigation. Horton did so, taking the deposition of one witness and defending the deposition of another, ultimately billing a total of 21.3 hours toward the matter. The depositions were held in Bakersfield and attended by Stump.

Around the same time, Horton decided she would leave Sagaser and began seeking employment elsewhere. Horton connected with a friend who worked in Borton Petrini's Fresno office and secured an interview with lawyers from Borton Petrini's

---

[1] Defendant and respondent Jim's Supply Company, Inc., represented by separate counsel, has joined Dan Drake's briefing in full. Jim's Supply Company, Inc.'s counsel was not challenged in the underlying disqualification motion.

Fresno and Modesto offices. At that interview, Horton noted she knew Stump and had opposed him in a deposition, but she was not asked and did not mention it was for the Munger litigation. Horton received an offer to join Borton Petrini's Fresno office, handling family law and estate planning matters. Horton accepted this offer and informed Sagaser on March 25, 2024, that her last day with Sagaser would be April 11, 2024, and that she would begin working at Borton Petrini on April 15, 2024.

Horton began working at Borton Petrini on April 15, 2024, and spent her first week in the Fresno office training in the practice areas of family law and estate planning. Horton did not travel to the Bakersfield office, no one from the Bakersfield office traveled to the Fresno office, and there was no communication between Horton and Stump.

On April 19, 2024, Hamamjian informed Stump that Horton had worked on the Munger litigation, stated he had regularly discussed the litigation with her, and asserted the resulting conflict of interest required Borton Petrini to withdraw as counsel for Dan Drake. Upon receipt of Hamamjian's e-mail, Stump informed Borton Petrini's managing partner of the issue, and an investigation ensued. That same day, Borton Petrini instructed its IT provider to prevent direct e-mail correspondence between Stump and Horton and to prevent calls or messages between their phones. Horton was further barred from accessing files related to the Munger litigation and all matters associated with an insurance company tied to the litigation. Further, both the Fresno and Bakersfield offices were informed of the need to avoid any contact and instructed to restrict communication accordingly. The investigation continued through April 25, 2024, during which time all parties involved in the hiring decision were interviewed, as were Stump and Horton, and Borton Petrini came to believe that Horton had not communicated any information about the Munger litigation to Stump or any other attorney at Borton Petrini. On April 24, 2024, Borton Petrini requested Munger provide a written waiver to the conflict of interest

and agreed to maintain a robust and effective ethical screen. Munger declined. On April 26, 2024, Borton Petrini terminated Horton.

On May 3, 2024, Munger moved to disqualify Borton Petrini from representing Dan Drake in the litigation. The parties fully briefed the matter, and the trial court held a hearing on June 11, 2024. The court's tentative ruling was given at the outset of the hearing. The court noted that once Borton Petrini "learned of the potential conflict, they immediately screened … Horton through an ethical wall and conducted an investigation. She was terminated only about a week later." The court further found, "[F]rom the evidence supplied that there was, in fact, no confidential information concerning [Munger] disclosed to" Horton and "there was no confidential information concerning [Munger] disclosed to [Dan Drake] once she briefly became an employee of the Borton Petrini firm in their Frenso office. So in the court's view[,] there was no disclosure of confidential information here that would warrant disqualifying [Borton Petrini] …."

Following argument, the court affirmed its tentative. The court noted that blame could be assigned to all counsel, either for lack of communication, lack of proper procedures, or delay in raising issues, but found the clients blameless. It further noted that there was tension between two competing interests, Munger's interest in maintaining client confidentiality and Dan Drake's interest in its choice of counsel. The court then explained, "[J]ust given my understanding of the facts here, even if the court were to agree with [Munger] that there's a conclusive presumption that … Horton possessed confidential information belonging to Munger …, its's pretty clear to me that, with or without a formal ethical screen, once she joined [Borton Petrini] there, in fact, was no communication with the team representing [Dan Drake] in this case on any substantive matters pertaining to this case and so that, in fact, no confidential information was disclosed to them by … Horton either before or after she became employed by [Borton Petrini]." The court thus denied the motion.

4.

This appeal timely followed.[2]

## DISCUSSION

Munger challenges the denial of its motion to disqualify Borton Petrini on several grounds. Fundamentally, Munger argues that a conclusive presumption applies which determines both that Horton possessed material, confidential client information related to Munger and that this information was shared with attorneys at Borton Petrini. Munger further contends that these presumptions cannot be rebutted and cannot be affected by Horton's firing. Finally, Munger alleges the trial court improperly balanced public policy interests instead of applying the law as required. These claims result in arguments that the court abused its discretion in this matter by applying the wrong law and by making incorrect factual findings.

### *Standard of Review and Applicable Law*

A trial court can disqualify attorneys from representing clients in proceedings before the court. This power derives from the trial court's inherent authority to control the conduct of those connected to the judicial proceedings before the court. (*In re Charlisse C.* (2008) 45 Cal.4th 145, 159.) One basis for disqualifying an attorney from representing a client is a demonstrated conflict of interest that violates ethical guidelines. (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1145–1146.)

Such conflicts of interest commonly arise in two factual contexts. First, simultaneous conflicts can arise when an attorney seeks to represent multiple parties with potentially adverse interests in a single action. Second, successive conflicts can arise when an attorney seeks to represent a new client with interests that are potentially adverse to a former client. (*In re Charlisse C., supra*, 45 Cal.4th at p. 159.) In simultaneous

---

[2]    This court notes that Munger also filed a writ petition on the same issue that was assigned case No. F088249. That petition was denied.

5.

conflicts, an attorney's underlying duty of loyalty triggers stringent measures and strict rules to protect against this most egregious kind of conflict. (*Id.* at p. 160.) In successive conflicts, the underlying duty is one of confidentiality, which triggers a less stringent substantial relationship test that considers the nature of the conflicting representations. (*Flatt v. Superior Court* (1994) 9 Cal.4th 275, 283.)

This case involves allegations falling under the successive conflicts line of cases. In such cases, the substantial relationship test "mediates between two interests that are in tension in such a context—the freedom of the subsequent client to counsel of choice, on the one hand, and the interest of the former client in ensuring the permanent confidentiality of matters disclosed to the attorney in the course of the prior representation, on the other. Where the requisite substantial relationship between the subjects of the prior and the current representations can be demonstrated, access to confidential information by the attorney in the course of the first representation (relevant, by definition, to the second representation) is *presumed* and disqualification of the attorney's representation of the second client is mandatory …." (*Flatt v. Superior Court, supra*, 9 Cal.4th at p. 283.)

Where an attorney is disqualified from a matter if personally involved, a risk arises that confidential information may be shared with others associated with that attorney. Accordingly, the case law recognizes that disqualification can be imputed to a lawyer's associates. (See *City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839, 847 [noting that then current ethical rules did not address when an attorney's conflict would be imputed to their law firm, an analysis then governed solely by case law].)

The general rule held that imputation was required, particularly when the lawyer involved switched sides in an ongoing litigation. (*National Grange of Order of Patrons of Husbandry v. California Guild* (2019) 38 Cal.App.5th 706, 713.) However, there remained an open issue regarding whether imputation was mandatory or whether

6.

appropriate measures to screen the disqualified lawyer from the case could be utilized to allow the firm to continue representing a client where the lawyer changing firms was less directly related to the ongoing litigation. (*Kirk v. First American Title Ins. Co.* (2010) 183 Cal.App.4th 776, 800–801 (*Kirk*).) Moreover, once a disqualified attorney left the challenged firm, the imputation analysis questioned whether confidential material had actually been shared with the target firm. (*Fluidmaster, Inc. v. Fireman's Fund Ins. Co.* (2018) 25 Cal.App.5th 545, 552.) Given the wide array of situations that could trigger disqualification, courts generally settled on a factual inquiry to determine whether imputing the disqualified lawyer's conflict to the entire firm was appropriate. (*California Self-Insurers' Security Fund v. Superior Court* (2018) 19 Cal.App.5th 1065, 1078.)

In 2018, the California Supreme Court passed new ethical rules that coalesced these existing case law principles into a defined set of rules. While the case law continues to provide substantial guidance on the history and intent behind a lawyer's ethical obligations in California, the foundational touchstones of any disqualification motion alleging an ethical violation are the current State Bar Rules of Professional Conduct.[3]

Relevant here, a "lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed written consent." (Rule 1.9(a).)

"While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by rule[] … 1.9 unless [¶] … [¶] … the prohibition is based upon rule 1.9(a) … and arises out of the prohibited lawyer's association with a prior firm, and [¶] (i) the prohibited lawyer did not substantially participate in the same or a substantially related matter; [¶] (ii) the

---

[3]   Undesignated references to rules are to the Rules of Professional Conduct.

prohibited lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom; and [¶] (iii) written notice is promptly given to any affected former client to enable the former client to ascertain compliance with the provisions of this rule, which shall include a description of the screening procedures employed; and an agreement by the firm to respond promptly to any written inquiries or objections by the former client about the screening procedures." (Rule 1.10(a).)

Finally, when "a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm, unless: [¶] (1) the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and [¶] (2) any lawyer remaining in the firm has information protected by Business and Professions Code section 6068, subdivision (e) and rules 1.6 and 1.9(c) that is material to the matter." (Rule 1.10(b).)

We generally review a disqualification ruling for abuse of discretion. (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc., supra*, 20 Cal.4th at p. 1143.) Where the trial court has resolved factual disputes to reach its ruling, we defer to the trial court's factual resolutions provided they are supported by substantial evidence and will review conclusions drawn from those facts for abuse of discretion. (*Id.* at pp. 1143–1144.) If no material disputed facts exist, we review the trial court's determination as a question of law. (*Id.* at p. 1144.) A disposition that rests on an error of law constitutes an abuse of discretion. (*In re Charlisse C., supra*, 45 Cal.4th at p. 159.) However, a trial court's application of the law to the facts is only reversible if arbitrary and capricious. (*Ibid.*)

### *The Trial Court Did Not Abuse Its Discretion*

As noted above, Munger raises several arguments against the analysis and conclusions adopted by the trial court. In doing so, Munger cites primarily to an extensive body of case law predating 2018. Although Munger cites the current Rules of

8.

Professional Conduct in passing, neither party presents an analysis that considers the specific requirements of those rules in their briefing. This is unfortunate, particularly because Munger cited and discussed these rules before the trial court. Applying the facts of this case to the guidance set forth in the current rules readily resolves this appeal. Ultimately, this analysis demonstrates no error in the trial court's ruling.

While the parties disagree on the depth of the work Horton undertook when employed by Sagaser, there is no dispute that Horton appeared on behalf of Munger at two depositions. Under rule 1.9(a), Horton was therefore ethically barred from representing Dan Drake, a party with interests materially adverse to Horton's prior client, in the continuing litigation without Munger's written consent. Importantly, the record contains no indication that Horton did, in fact, seek to represent Dan Drake in the ongoing litigation. Rather, any ethical issues that arose from Horton's transfer to Borton Petrini came from the prohibition on firm lawyers representing clients that any one of those lawyers could not represent alone, as set out in rule 1.10(a).

There is no doubt that hiring Horton created an ethical conflict given rule 1.10(a). Upon her hire, Borton Petrini's lawyers could not represent a client that Horton would be precluded from representing herself. Borton Petrini recognizes as much and admits "[m]istakes were made." Although Borton Petrini argues that Sagaser should have raised its issues in a timelier manner, the error in hiring Horton was not attributable to any conduct on Sagaser's behalf. Absent additional steps, hiring Horton would require Borton Petrini to cease representing Dan Drake in the continuing proceedings.

Under the rules, there are two possible ways to avoid disqualification in these circumstances. Under the first, Borton Petrini could keep Horton as an associated attorney. To avoid disqualification, Borton Petrini would then need to demonstrate that Horton did not substantially participate in the underlying litigation, timely screen Horton from its other lawyers, and provide Munger with adequate written notice under the rules. (See rule 1.10(a)(2) [providing requirements].) Under the second, Borton Petrini could

9.

end its association with Horton. It would then be free to represent entities adverse to Horton's past clients unless its remaining lawyers retained material, confidential information derived from representing Munger. (See rule 1.10(b) [same].)

Borton Petrini chose the second route, terminating Horton within about 10 days of her official start date and after implementing an ethical screen while investigating the situation. Having chosen to disassociate with Horton, Borton Petrini could thereafter represent Dan Drake unless the court found (1) the representation was on the same matter that Horton represented Munger—a point not in dispute—and (2) that any Borton Petrini lawyer remaining in the firm had material, confidential information derived from representing Munger. On this latter point, there is no contention that any Borton Petrini lawyer other than Horton represented Munger in a disqualifying manner.

The relevant question, then, is whether Horton provided any material, confidential information about the litigation to any other Borton Petrini lawyer. Here, the trial court specifically found that "with or without a formal ethical screen, once [Horton] joined [Borton Petrini] there, in fact, was no communication with the team representing [Dan Drake] in this case on any substantive matters pertaining to this case and so that, in fact, no confidential information was disclosed to them by … Horton either before or after she became employed by [Borton Petrini]."

This finding was supported by substantial evidence in the record. A declaration from a partner in Borton Petrini's Los Angeles office showed Horton was hired to work in Borton Petrini's Fresno office on family law and estate planning matters, starting on April 15, 2024. None of the lawyers working in the Fresno office were involved in the Munger litigation. When Borton Petrini claimed it learned of the conflict on April 19, 2024, it implemented an ethical screen that prevented e-mail and phone communication between Horton and Stump, barred Horton from accessing files related to the litigation, and limited any potential communication between the Fresno and Bakersfield offices. Borton Petrini confirmed that Horton had not discussed any aspects of the litigation with

10.

Stump and had not discussed the litigation—aside from noting she had met Stump at a deposition—during her interview process.

Borton Petrini's investigation further indicated that Horton had not worked on the Munger litigation aside from the two depositions and had not been encouraged to apply to Borton Petrini until she had first affirmatively sought out a prior contact in the Fresno office and expressed a desire to leave Sagaser. Borton Petrini's investigation also determined that Horton had not spoken to anyone in Borton Petrini about the Munger litigation. The investigating partner's declarations were then buttressed by similar declarations from Horton, Stump, and others. The court could rely on these declarations as substantial evidence supporting its conclusion. (See *Ochoa v. Fordel, Inc.* (2007) 146 Cal.App.4th 898, 909–910.)

Munger challenges the timeliness and effectiveness of the ethical screen and asserts Borton Petrini's declarations are self-serving. We do not agree. A timely ethical screen[4] is only an express requirement for continuing representation where the prohibited lawyer continues to work at their new firm. (Rule 1.10(a).) Where the prohibited lawyer has been disassociated, the presence and effectiveness of an ethical screen is relevant to the ultimate question whether any lawyers remaining in the firm possess material, confidential client information, but it is not a requirement for avoiding disqualification. (Rule 1.10(b).) Here, the court was presented with evidence showing implementation of an ethical screen that included physical and geographic distance between the relevant attorneys, a separation of departments, prohibitions against improper communications, physical and digital barriers to prevent access to confidential information, and ultimately Borton Petrini's disassociation with Horton. The court could rely on these measures to

---

[4]     Munger points to little law defining what constitutes a timely screen, only arguing one imposed after the lawyer starts at the new firm is inherently improper. We take no position on the timeliness of a screen implemented when a firm first learns of a new lawyer's alleged conflict.

make the factual determination no lawyer at Borton Petrini retained material, confidential client information related to Munger. (See *Kirk, supra*, 183 Cal.App.4th at pp. 810–811 [outlining typical elements of an effective ethical wall].)

Likewise, the declarations are not merely self-serving representations that no information was exchanged. Rather, they outline the measures taken to understand what communications could have occurred and prevent future communication, the express instructions that none should occur, the physical and digital measures to prevent improper communications, and confirmation that those measures were understood, followed, and believed to be effective. (See *Kirk, supra*, 183 Cal.App.4th at p. 810 [noting that it "is not sufficient to simply produce declarations stating that confidential information was not conveyed or that the disqualified attorney did not work on the case; an effective wall involves the imposition of *preventive measures* to guarantee that information will not be conveyed"].)

Munger's remaining arguments either allege the trial court erred in other aspects of its analysis, such as in determining whether Horton had confidential information to share or in balancing the interests of the parties, or failed to apply the correct case law. However, given the specific guidelines provided by rule 1.10, when an attorney is no longer associated with the firm subject to the disqualification motion, none of these arguments can demonstrate reversible error as the trial court found that no material, confidential client information related to Munger was passed to any attorney at Borton Petrini. Further, although Munger relies heavily on language in *Kirk* suggesting that when an attorney who has worked on a case switches sides, both the attorney and their new law firm are disqualified from representing any clients in that matter, Munger's reading is only partially correct. Where an attorney stays with their new firm, rule 1.10(a)'s substantial participation in similar matters test captures *Kirk*'s warning that no amount of screening can avoid disqualification of an involved attorney switching sides

in an ongoing litigation.[5]  (*Kirk, supra*, 183 Cal.App.4th at p. 814.)  Where an attorney has disassociated, though, rule 1.10(b) captures *Kirk*'s acknowledgement that vicarious disqualification is not necessary if no one other than the departed attorney obtained material, confidential client information.  (*Kirk*, at p. 815.)

Borton Petrini disassociated with Horton, and the trial court found no attorneys at Borton Petrini held material, confidential client information related to Munger.  We therefore find no abuse of discretion in the trial court's denial of Munger's motion to disqualify Borton Petrini.

## DISPOSITION

The order is affirmed.  Costs are awarded to respondents Dan Drake and Jim's Supply Company, Inc.

HILL, P. J.

WE CONCUR:

PEÑA, J.

HARRELL, J.

---

[5]     We take no position on whether the work here, essentially 20 hours across two depositions, meets the substantial participation test under rule 1.10(a).

13.